### In re AMERICAN METALS CORPORATION, Debtor.

**Bankruptcy No. 81–20260.**

United States Bankruptcy Court, D. Kansas.

July 13, 1983.

Gage & Tucker, Wassberg, Gallager & Jones, Kansas City, Mo., Charles D. Kugler, Kansas City, Kan., for debtor.

Edward L. Bittner, Leawood, Kan., trustee.

Donald E. Bucher, Kansas City, Kan., for trustee.

Thomas M. Mullinix, Kansas City, Kan., for Creditors Committee.

Michael R. Roser, Kansas City, Mo., F. Stannard Lentz, Mission, Kan., for Heller & Co.

Mendel Small, Kansas City, Mo., Laurence L. Ferree, III, Overland Park, Kan., for Aluminum Co. of America.

Carol Park, Asst. U.S. Trustee, Wichita, Kan.

## MEMORANDUM OPINION

BENJAMIN E. FRANKLIN, Bankruptcy Judge.

This matter came on for hearing on January 26, 1983, upon the First Amended Application of Walter E. Heller & Co. for an Order Directing Payment by Trustee of Attorney Fees, Interest, and Other Expenses, and on the Trustee's and Creditors' Committee's Objections to said Application. Walter E. Heller & Co. (Heller) appeared by counsel, Michael Roser, of Berman, DeLeve, Kuchan & Chapman; and local counsel, F. Stannard Lentz. The trustee, E.L. Bittner, appeared in person and by counsel, Donald E. Bucher, of McDowell, Rice & Smith, Chrtd. The Creditors' Committee appeared by counsel, Thomas M. Mullinix, of Evans, Mullinix & Jarczyk. Aluminum Co. of America (ALCOA) appeared by counsel, Scott Goldstein, of Spencer, Fane, Britt & Browne.

## FINDINGS OF FACT

Based on the exhibits, testimony of witnesses, memoranda, pleadings and the file herein, the Court finds as follows:

1. That the Court has jurisdiction over the parties and the subject matter pursuant to Rule 42 of the United States District Court, District of Kansas.

2. That on March 23, 1981, American Metals Corporation (AM) filed a petition under Chapter 11 of Title 11, United States Code, in this Court.

3. At the time of the petition, AM was indebted to Heller in the principal amount of $638,159.49 plus interest. Heller was and is secured by a first, prior and duly perfected security interest in virtually all of AM's assets, including accounts receivable, equipment, inventory, and the proceeds thereof. It is undisputed that Heller was and is oversecured.

4. That the case was converted to a Chapter 7 on September 14, 1981, upon Heller's motion, and on September 17th, E.L. Bittner was appointed trustee.

5. That the trustee's liquidation resulted in full payment of Heller's principal balance due of $638,159.49. By January, 1983, the trustee had $88,000.00 on hand to distribute.

6. That the parties agree that AM still owes Heller $8,962.89 in prepetition interest.

7. That AM contends that this $8,962.89 obligation should be setoff by the amount of interest that accrued on a shear during the time Heller contested the trustee's sale of the shear. The trustee testified that the accrued interest on the shear during this time was $3,400.00; James Curren, AM's former controller, testified that it was $1,500.00. Neither man verified his testimony with documents. The shear was ultimately sold for its original asking price, $31,750.00, when Heller withdrew its objection to the sale. Heller had maintained that the shear could be sold for some $3,250.00 to $8,250.00 more according to its appraised value.

8. That the parties disagree whether AM still owes Heller postpetition interest. Heller contends that AM under-paid postpetition interest by $7,623.00. This disagreement arose because Heller adjusted the contract rate of interest once a month, while AM adjusted it daily. The parties' loan and security agreement, entered into on April 7, 1980, provides that interest will be calculated and paid as follows:

*"2.9 Borrower's Liabilities (other than interest) shall bear interest, payable monthly, calculated (on a daily basis) on a 360-day year comprised of twelve (12) months at a per annum rate equal to five percent (5%) per annum in excess of the prime (or equivalent) rate of interest charged on and from time to time hereafter by FIRST NATIONAL BANK OF CHICAGO to its largest and most creditworthy domestic corporate customers for ninety (90) day unsecured loans; provided, however, that in the event of a sale by Lender to Participant of an 'Investment' (determined and defined in accordance with the Participation Agreement therewith), the rate of interest to be charged (from time to time) by Lender to Borrower upon the portion of Borrower's Liabilities (other than interest) represented by Participant's respective Investment therein shall be at the respective rate of interest provided therefor in said Participation Agreement. Such rate shall be calculated by Lender on the last day of each month during the original term and each renewal term hereof, giving effect to each increase or decrease, if any, in prime during such month to determine the rate in the following month."*

9. That in addition to prepetition and postpetition interest, Heller wants a $20,000.00 termination charge allowed as part of its secured claim. This charge arose from ¶ 2.11 of their loan and security agreement and was triggered by AM's bankruptcy, an event constituting default. The loan and security agreement states in pertinent part:

*"2.11 Borrower hereby agrees that in the event that Borrower elects to terminate this Agreement and/or the Other Agreements prior to the end of the original term, or prior to the end of any subsequent term, Borrower will pay to Lender or to whom Lender so directs the total of the following: (a) an amount equal to $20,000.00 times the number of months remaining in the then current term (including the month in which such termination occurs); (b) any amount of interest accrued though the end of the month in which such termination occurs, with respect to the outstanding Borrow-*

er's Liabilities; and (c) the outstanding Borrower's Liabilities.

\* \* \* \* \* \*

### 10. Default

*10.1 The occurrence of any one of the following events shall constitute a default ('Event of Default') by Borrower under this Agreement:*

\* \* \* \* \* \*

*(e) if a petition under any section or chapter of the Bankruptcy Act or any similar law or regulation shall be filed by Borrower or if Borrower shall make an assignment for the benefit of its creditors or if any case or proceeding is filed by Borrower for its dissolution or liquidation;"*

10. That Heller also wants $39,924.75 in attorney fees allowed as part of its secured claim. The loan and security agreement provided for attorney fees in the event of AM's default, as follows:

*"10.10 If at any time or times on or after an Event of Default Lender employs counsel for advice or other representation (a) with respect to the Collateral, this Agreement or the Other Agreements, (b) to represent Lender in any litigation, contest, dispute, suit or proceeding or to commence, defend or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit or proceeding (whether instituted by Lender, Borrower or any other Person) in any way or respect relating to the Collateral, this Agreement, the Other Agreements or Borrower's affairs; (c) to enforce any rights of Lender against Borrower or any other Person which may be obligated to Lender by virtue of this Agreement or the Other Agreements, including, without limitation, the Obligors; (d) to protect, collect, sell, liquidate or otherwise dispose of the Collateral; and/or (e) to attempt to or to enforce Lender's security interest in the Collateral, the reasonable attorneys' fees arising from such services and all expenses, costs, charges and other fees of such counsel or*

*of Lender in any way or respect arising in connection with or relating to any of the events described in this Paragraph shall be paid by Borrower to Lender. Without limiting the generality of the foregoing, such expenses, costs, charges and fees include: (i) accountant's fees, costs and expenses; (ii) court costs and expenses; (iii) court reporter fees, costs and expenses; (iv) long distance telephone charges; (v) telegram charges; (vi) expenses for travel, lodging and food; and (vii) expenses incurred in fulfilling, in whole or in part, any order of any Obligor from which an Account has arisen or will arise."*

Heller was represented by several counsel. Michael Berman, of the firm of Berman, DeLeve, Kuchan & Chapman, charged $75.00 per hour for his services and worked 241.70 hours on the case. Herbert R. Fineburg, an associate of the firm, worked 327.-10 hours at $60.00 per hour. Two other associates contributed 9 hours at $60.00 per hour. A law clerk worked 22.50 hours at $30.00 per hour. One other partner of the firm, Michael R. Roser, worked 1.50 hours at $75.00 per hour. F. Stannard Lentz, the local counsel, also charged $75.00 per hour, for a total of $843.75. Mr. Berman, Lentz and Roser are experienced bankruptcy practitioners.

11. That Heller's attorneys took an active role in this bankruptcy proceeding. They first took part in negotiations and ultimately in a full day hearing regarding AM's motion for use of Heller's cash collateral. The matter was hotly contested and Heller filed post judgment motions with respect to the Court's cash collateral order. Heller also had to spend an inordinate amount of time getting AM, as a debtor in possession, to comply with Court orders: to let Heller inspect its collateral; and to file periodic financial reports. Heller also spent time: trying to get an examiner appointed; contesting AM's application to incur $500,-000.00 in credit secured by a lien senior to Heller's; moving to convert the case to a Chapter 7; and trying to get Rule 205

examinations from AM's uncooperative principals. Heller moved to dismiss AM's $350,000.00 breach of contract suit against Heller, filing a 20-page brief raising the same argument that the Supreme Court later adopted in *Northern Pipeline Construction Company v. Marathon Pipeline Company,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Finally, Heller filed a relief from stay complaint to collect its huge indebtedness. The bulk of Heller's attorneys' hours were spent during the time AM was a debtor in possession.

12. That Heller also wants a $744.75 appraisal fee allowed as part of its secured claim; and $498.85 in attorney expenses.

13. The parties agreed that Illinois law would govern their rights and remedies. The loan and security agreement stated in pertinent part:

"*1.17 TO INDUCE LENDER TO ACCEPT THIS AGREEMENT AND THE OTHER AGREEMENTS, BORROWER, IRREVOCABLY, AGREES THAT, SUBJECT TO LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER AGREEMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE COUNTY OF COOK, STATE OF ILLINOIS. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SAID COUNTY AND STATE. BORROWER HEREBY IRREVOCABLY APPOINTS AND DESIGNATES THE SECRETARY OF STATE OF ILLINOIS, WHOSE ADDRESS IS SPRINGFIELD, ILLINOIS, OR ANY OTHER PERSON HAVING AND MAINTAINING A PLACE OF BUSINESS IN SUCH STATE, WHOM BORROWER MAY FROM TIME TO TIME HEREAFTER DESIGNATE (HAVING GIVEN TEN DAYS WRITTEN NOTICE THEREOF TO LENDER) AS BORROWER'S TRUE AND LAWFUL ATTORNEY AND DULY AUTHORIZED AGENT FOR ACCEPTANCE OF SERVICE OF LEGAL PROCESS. BORROWER AGREES THAT SERVICE OF SUCH PROCESS UPON SUCH PERSON SHALL CONSTITUTE PERSONAL SERVICE OF SUCH PROCESS UPON BORROWER. SUCH PARTY, WITHIN FIVE (5) DAYS AFTER RECEIPT OF ANY SUCH PROCESS, SHALL FORWARD THE SAME BY CERTIFIED OR REGISTERED MAIL, TOGETHER WITH ALL PAPERS AFFIXED THERETO, TO BORROWER AT ITS PRINCIPAL PLACE OF BUSINESS SPECIFIED AT THE BEGINNING OF THIS AGREEMENT. BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST BORROWER BY LENDER IN ACCORDANCE WITH THIS PARAGRAPH.*"

### CONCLUSIONS OF LAW

### I. THE ATTORNEY FEES, EXPENSES, AND APPRAISAL FEE

Heller applied for allowance of its attorney fees as secured under § 506(b) of Title 11, United States Code. That section states:

"§ 506. Determination of secured status.

*(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.*"

Two issues arise with respect to Heller's application for attorney fees. First, is § 506(b) applicable when state law prohibits attorney fee clauses in notes; and if not, does Kansas or Illinois law govern the note herein? Secondly, if Heller's fees are allow-

able under § 506(b), is the amount requested "reasonable" within the meaning of that section?

■ With respect to the first issue, Heller's position is that § 506(b) applies notwithstanding contrary state law, but in any event, Illinois law, which allows attorney fee clauses, applies because the note expressly provides that Illinois law shall govern. The trustee and creditors' committee contend that § 506(b) is inapplicable when state law proscribes attorney fee clauses, because under § 502(b)(1), claims are allowable only to the extent enforceable under any applicable law; and that Kansas law, which proscribes attorney fee clauses, is applicable herein.[1] Alcoa's position is that attorney fee clauses are a procedural, rather than substantive part of the contract, and the law of the forum state, Kansas, is thus applicable.

This Court finds it unnecessary to address the numerous arguments raised as to conflicts of law, choice of law, or procedural-substantive distinctions. A review of the legislative history, case law and commentators convinces this Court that § 506(b) allows an oversecured creditor attorney fees if provided for in the security agreement, notwithstanding contrary state law.[2]

The legislative history of § 506(b) is admittedly confusing. In the original version of the House Bill, H.R. 8200, § 506(b) allowed attorney fees, but only, *"to the extent collectible under applicable law"*, thus recognizing that § 502(b)(1) limited allowed secured claims in that respect. See H.R. 8200, 95th Cong., 1st Sess. § 506(b) (1977). In the Senate version, S.2266, 95th Cong., 2d Sess. (1978), § 506(b) allowed attorney fees, but the language limiting fees to the extent collectible under applicable law was omitted. Yet, in both the House and Senate reports, the drafters' stated intent was to codify current law. Apparently, the House and Senate were confused as to the status of current law. See H.R. 95–595, 95th Cong., 1st Sess. (1977) 356–357, S.R. 95–989, 95th Cong., 2d Sess. (1978) 68, U.S. Code Cong. & Admin.News 1978, p. 5787. Clearly, the then prevailing case law was that state law determined the allowance of attorney fees under secured instruments. *Security Mortgage Co. v. Powers,* 278 U.S. 149, 153–54, 49 S.Ct. 84, 85–86, 73 L.Ed. 236 (1928); *In re East Side Investors,* 7 B.R. 515, 517 (D.C.N.D.Ga.1980) [Act of 1898 case]. Thus, the House and Senate Reports are not accommodative in determining legislative intent.

However, the final statements with respect to the passage of a bill are generally more accurate expressions of legislative intent than earlier House or Senate Reports out of committee. See K. Klee, "Legislative History of the New Bankruptcy Code", 54 Am.Bankr.L.J. 275, 294–295 (1980). Here, the final statements of Rep. Edwards and Sen. DeConcini, the managers of the respective bills in the House and Senate, are consistent. They agree that § 506(b) applies irrespective of state law, as Rep. Edwards stated in 124 Cong.Rec. H 11095 (daily ed. Sept. 28, 1978):

> *"Section 506(b) of the House amendment adopts language contained in the Senate amendment and rejects language contained in H.R. 8200 as passed by the House. If the security agreement between the parties provides for attorneys fees, it will be enforceable under title 11 notwithstanding contrary law..."*

Most courts agree that legislative intent was that § 506(b) apply notwithstanding

---

1. K.S.A. 58–2312 prohibits and invalidates attorney fee clauses in notes, and *Young v. Nave,* 135 Kan. 23, 10 P.2d 23 (1932) described the strong public policy against such clauses in Kansas. However, such public policy has eroded somewhat in the 50 years since *Young v. Nave, supra.* A number of Kansas statutes now allow attorney fees. See Note, "Recovery of Attorney Fees in Kansas". 18 Wash.L.J.

535, (1979). K.S.A. 58–2312 has not been repealed, however.

2. In fact, in *Executive Financial Services, Inc. v. Brooks, infra,* this Court allowed an oversecured creditor attorney fees with respect to a note made in and governed by Kansas law. There, however, the debtor did not raise the issue of the applicability of § 506(b) in light of the contrary Kansas law.

contrary state law. See *In re Virginia Foundry Co., Inc.,* 9 B.R. 493, 496–497 (D.C. W.D.Va.1981); *In re Carey,* 8 B.R. 1000, 7 B.C.D. 310, 311–312, CCH ¶ 67,847 (Bkrtcy. S.D.Cal.1981); *In re Scarboro,* 13 B.R. 439, 442, 8 B.C.D. 72, 4 C.B.C.2d 1222 (D.C.M.D. Ga.1981).

The purportedly contrary cases cited by the trustee and creditors' committee are distinguishable or actually in accord with the above cited cases. *In re East Side Investors, supra.; Security Mortgage Co. v. Powers, supra.;* and *Rubenstein v. Nourse,* 70 F.2d 482 (8th Cir.1934) are distinguishable as cases decided under the Bankruptcy Act of 1898. *In re Cipriano,* 8 B.R. 697, CCH ¶ 67828 (Bkrtcy.D.R.I.1981) is a distinguishable Chapter 13 case regarding the allowability of attorney fees to a creditor for its contributions in a valuation hearing. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) was an Act case regarding whether state law or a federal rule of equity should determine a mortgagee's rights to rents collected.

Furthermore, commentators agree that § 506(b) provides for the enforcement of attorneys' fee clauses in security agreements although such clauses may be invalid under state law. See 3 Collier on Bankruptcy ¶ 506.06 (15th ed.) at 506–16 et seq.; Clark, *The Law of Secured Transactions under the Uniform Commercial Code,* ¶ 6.1 (1980) at 6–4.

Therefore, this Court finds that Heller's attorney fees provided for in the security agreement are allowable as secured under § 506(b) notwithstanding contrary Kansas law and irrespective of which state's law governs the note and security agreement.

Given that Heller's attorney fees are allowable, the next issue is whether the amount requested, $39,924.75, is "reasonable" within the meaning of § 506(b). This requirement, that the fee be reasonable, gives the Court discretion to review the amount requested and to avoid any potential for abusive use of § 506(b). *In re Carey, supra,* 8 B.R., at 1004, 7 B.C.D., at 312.

In assessing the reasonableness of attorney fees under § 506(b) this Court has heretofore applied the test used by the Tenth Circuit in a bankruptcy case and the Fifth Circuit in a non-bankruptcy case. See *Executive Financial Services, Inc. v. Brooks,* 24 B.R. 447, 450–451 (Bkrtcy.D.Kan.1982), applying the test used in *In re Permian Anchor Services, Inc.,* 649 F.2d 763, 768 (10th Cir.1981) and *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974).

The test sets forth twelve factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undersirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

The trustee contends that the unvarying $75.00 per hour rate of Michael Berman, was too high and that Heller, as a high risk lender, charged high interest to cover its attorney's fees, in part.

The Court finds that this case required a considerable amount of time and labor of Heller's attorneys. In January, 1981, two months before AM's bankruptcy petition, Heller's attorneys took on the task of collecting over $638,000.00 in principal and, ultimately, $117,000.00 in interest. On a daily basis, from January, 1981 to October, 1982, Heller's attorneys efficiently and successfully labored to collect these sums, before and during the bankruptcy proceedings, expending a total of 601.8 hours. During the bankruptcy proceedings, Heller's attorneys labored at least four hours a day, on almost a daily basis. Obviously, this case precluded other employment, to some extent.

The services rendered were numerous, and included: contesting a motion for the use of cash collateral and a later motion to

use cash collateral outside of the ordinary course of business; applying for the appointment of an examiner; inspecting its collateral; defending a $350,000.00 breach of contract suit filed by AM; Rule 205 examinations of AM's principals; contesting AM's motion for extension of time to file a plan; motion and order converting case to Chapter 7; relief from stay complaint; and monitoring liquidation of its collateral. While these services were not atypical of those in creditor representation in a Chapter 11, AM's opposition at every juncture rendered the task complicated and difficult. AM opposed Heller's position on the cash collateral order, motion for examiner, inspection of collateral and motion for conversion. AM's principals were uncooperative in Heller's Rule 205 examinations, and most questions had to be certified. Although the trustee contends that Heller's opposition to the sale of the shear was a time wasting vendetta, the Court finds that AM's continual obstructions and lack of cooperation cost Heller a significant amount of time and labor. Therefore, the Court accepts the total billed hours of Heller's attorneys as reasonable.

While the Court finds that Heller's attorneys are experienced and skilled attorneys in the areas of bankruptcy and commercial law, the Court finds that Michael Berman's hourly rate is higher than the customary fee of experienced bankruptcy practitioners in Kansas City, Kansas. Furthermore, although Herb Fineburg, an associate billed at $60.00 per hour, did the majority of the work, after he left the firm in August of 1981, Berman, a partner, did virtually all of the work, at $75.00 per hour. Some of the services Berman performed did not require his skills and experience and could have been done at the lesser rate of an associate. Accordingly, the Court finds that it is equitable to reduce Berman's fee from $75.00 to $70.00 per hour, thus reducing Berman's fee from $18,127.50 to $16,919.00.

**3.** They also argued that enforcing a termination clause triggered by bankruptcy would contravene § 365's invalidation of bankruptcy clauses in executory contracts. The court dismisses

The Court further finds that the rates charged by the associates and law clerk are reasonable. The Court finds that the $843.75 fee to the local counsel based on a $75.00 hourly rate should be reduced to $787.50, or $70.00 per hour. Thus, the Court allows Heller's attorneys a fee in the total amount of $37,816.25.

The Court also finds that the requested $498.85 in attorneys expenses and $744.75 appraisal fee are reasonable. No one objected to their allowance, so the Court allows those expenses as well.

Thus, the total of Heller's attorneys fees and expenses and appraisal fee allowed as secured under § 506(b) is $39,059.85.

## II. THE $20,000.00 TERMINATION CHARGE

■ Heller also requested a $20,000.00 "termination charge" as provided for in paragraph 2.11(a) of the security agreement. Said paragraph states that if AM elects to terminate the agreement early, Heller is entitled to a termination charge of $20,000.00 times the number of remaining months in the term of the agreement, including the month of termination. Paragraph 10.1(e) of the agreement states that bankruptcy constitutes default. Thus, by the terms of the agreement, when AM filed bankruptcy, Heller became entitled to a termination charge. Heller contends this charge is allowable under § 506(b) as a reasonable fee, cost or charge.

The trustee, Creditors' committee and ALCOA contend that such a termination charge is not allowable under § 506(b).[3] The issue appears to be one of first impression. CF. *In re United Merchants & MFRS., Inc.*, 674 F.2d 134 (2d Cir.1982) where the court allowed contractual liquidated damages as part of an *unsecured* claim in a Chapter XI case under the *Act*; *Matter of Astro-Netics, Inc.*, 28 B.R. 612 (Bkrtcy.E.D.Mich.1983) where the court al-

this argument as § 365's invalidation of bankruptcy clause is not applicable to contracts to lend money to the debtor. See § 365(e)(2)(B).

lowed an oversecured creditor *actual collection expenses* and *actual loan servicing fees* under § 506(b). This Court's research disclosed no case, however, resolving the issue herein of the allowability of a termination charge.

The legislative history of § 506(b) sheds no light on the question. It does not define what fees, costs or charges are allowable. See S.R. 95–989, 95th Cong., 2d Sess., (1978) 68; Remarks of Rep. Edwards, the floor manager of House Bill, in 124 Cong.Rec. H 11095 (daily ed. Sept. 28, 1978).

Heller urges the Second Circuit's decision in *In re United Merchants & MFRS, Inc., supra,* as persuasive authority for the proposition that termination charges are allowable under § 506. This Court finds that case distinguishable and not authoritative for several reasons. First, that case did not involve construction of § 506(b). Rather it addressed the allowability of a liquidated damage clause as part of an unsecured claim. Here, the allowability of Heller's termination charge as *unsecured* is not before the court; Heller's attempt is to get the termination charge *secured* status.

Secondly, in *United Merchants,* the court found that the liquidated damage clause was a true liquidated damage clause and not a penalty. There the clause stated that upon default and accelleration of the note, the lender would be entitled to an amount equal to the prepayment charge that would be payable if the borrower had paid the note on the date of default. The Second Circuit found that such a clause did not provide damages plainly disproportionate to the possible loss. Moreover, it found that actual damages were not easily ascertainable at the time the parties entered into the note, since the collateral was a nine million dollar jet and damages would depend on a host of factors, including the rate of return, duration of the loan, and marketability of the collateral.

The Court finds that the termination charge clause herein is in the nature of a penalty rather than a true liquidated damages clause. Examining the exigencies in the light most favorable to Heller, this Court fails to see how $20,000.00 per month for the remaining term of the note is reasonable or proportionate to the loss Heller would sustain by AM's default. Furthermore, this was not a situation where Heller could not possibly estimate its damages. Its collateral was equipment and accounts receivable, more susceptible to appraisal and more marketable in a liquidation than the jet in *United Merchants.*

Moreover, this Court is of the view that § 506(b) is limited to actual costs, charges or damages. Section 506(b) is an extraordinary remedy for oversecured creditors; and it should not be read so broadly as to allow all purported expenses, whether actual, estimated or illusory.

So far, no court has allowed anything but actual costs under § 506(b). That is not to say a liquidated damage clause should not be given credence in allowing costs or damages under § 506(b). But where, as here, the creditor failed to show that it was a liquidated damage clause rather than a penalty, the Court should disallow such costs under § 506(b). Accordingly, the $20,000.00 termination charge is not allowed as a part of Heller's secured claim.

### III. PRE–PETITION AND POST–PETITION INTEREST

Heller requests allowance of its post-petition interest pursuant to § 506(b), as well as pre-petition interest. Two issues arise with respect to its application for interest: First, whether AM has paid all post-petition interest in full; and secondly, whether AM is entitled to setoff part of the prepetition interest due and owing to Heller.

■ With respect to the post-petition interest issue, Heller contends that $7,623.00 is still owing, while AM contends that it has paid Heller in full. The dispute arises because the parties calculated the interest differently. AM and Heller both used the formula of 5% over the prime rate of First National Bank of Chicago. However, Hel-

ler calculated such rate once a month, while AM's calculations allowed for daily adjustments of the prime rate.

Under the loan and security agreement, Heller's interest was to be adjusted daily. To the extent that Heller sold part of the agreement to an investment "participant", that portion of the interest would be calculated with only monthly adjustments. Thus, when Heller sold 50% of the agreement to two participants, 50% of the interest should have been calculated on a daily basis, and 50% of it on a monthly basis. The parties' confusion arose when in April, 1981, one month after AM's bankruptcy, Heller repurchased the 50% from the participants. AM thought that 100% of the accruing interest should again be calculated on a daily basis. Heller's position is unclear. It apparently either thought that the 50–50 dichotomy should be continued or that 100% of the interest should be calculated on a monthly basis.

This Court finds that the four corners of their agreement and the plain language of ¶ 2.9 support AM's position. Paragraph 2.9 states that Heller's interest is calculated daily. IF there are participants, then the interest on only the participants' portion is calculated monthly, while the interest on Heller's portion is still calculated daily. Thus, this Court finds that when Heller repurchased the participants' portion and became the sole lender again, 100% of the interest should have been calculated daily. Thus, AM's calculations were correct, and no postpetition interest is due and owing Heller.

■ With respect to Heller's application for $8,962.89 in pre-petition interest, the parties do not dispute that this amount is due and owing to Heller. The trustee contends, however, that $3,400.00 of the $8,962.89 should be setoff because of Heller's alleged unwarranted opposition to the trustee's sale of a shear. The trustee claims it cost the estate $3,400.00 in additional interest on the shear during the time Heller contested the sale. The trustee further contends that Heller's ultimate withdrawal of its objection to the sale is evidence that its opposition was unreasonable, causing the estate to be saddled with $3,400.00 in unreasonable interest expense.

The Court finds that setoff is unwarranted for several reasons. First, although Heller's opposition to the sale of the shear may have been adversarial, it was not unreasonable. Heller's appraisal of the shear indicated that the trustee could sell the shear for a significantly higher price than offered. Heller, having a duly perfected first lien on the shear was warranted in objecting to a price it thought unreasonably low. Secondly, the trustee failed to submit evidence that Heller's delay cost the estate $3,400.00 in interest expense. James Curren, former AM controller, testified that it cost the estate $1,500.00; but the Court has no verification of that either. Thirdly, Heller's opposition only delayed the sale by one month; and Heller's withdrawal of its objection was probably pragmatism rather than concession. Therefore, the Court allows Heller the $8,962.89 in pre-petition interest as secured.

THIS MEMORANDUM SHALL CONSTITUTE MY FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER BANKRUPTCY RULE 752 AND RULE 52 OF THE FEDERAL RULES OF CIVIL PROCEDURE.