ERVIN, Circuit Judge:
This is an appeal from the district court’s reversal of a bankruptcy court’s award of attorney’s fees to an oversecured creditor. The bankruptcy court awarded attorney’s fees to Walter E. Heller and Company, Southeast, Inc. (hereinafter “Heller”), an oversecured creditor, under an attorney’s fee agreement with a bankrupt debtor in accordance with 11 U.S.C. § 506(b). The Unsecured Creditors’ Committee appealed, arguing that Heller's failure to comply with a state law notice requirement barred recovery of attorney’s fees. The district court reversed the award on the basis that, in enacting § '506(b) of the Bankruptcy Code, Congress intended state law to govern the enforceability of fee agreements, and that state law was not complied with in this case. Heller now appeals, arguing that the legislative history of § 506(b) indicates that Congress intended that fees should be awarded notwithstanding contrary state law. We agree with Heller’s interpretation of § 506(b), and accordingly we reverse the order of the district court and remand the case for an award of attorney’s fees.
I.
In May of 1980, K.H. Stephenson Supply Company (hereinafter “Stephenson”) executed a promissory note in favor of Heller for $325,000. Under the terms of the note, Heller had a secured interest in Stephenson’s assets which exceeded the value of the claim it secured. The note also provided for the payment of “all costs of collections, including a reasonable attorney’s fee of 15% in case the principal of this note or any interest thereon is not paid at the respective maturity thereof, or in case it becomes necessary to protect the security hereof, whether suit be brought or not.”
On February 9, 1982, Stephenson filed a petition for reorganization under 11 U.S.C. § 1101. On February 12, 1982, Heller was notified that Stephenson intended to use cash collateral to which Heller’s security agreements extended in order to finance Stephenson’s operations. Heller objected, and sought a temporary restraining order in bankruptcy court. Heller later filed a proof of claim for $130,741.90 plus interest, costs, expenses and attorney’s fees. Following a hearing, the parties agreed to a consent order which was entered on March 9, 1982. The consent order authorized Stephenson to continue financing its operations by incurring further indebtedness to Heller. Further indebtedness was secured to the same extent and subject to the same terms as the previous debts, including the attorney’s fees provision. The consent order was later modified following negotiations between Heller and Stephenson.
On May 14, 1982, Heller filed a petition pursuant to 11 U.S.C. § 506(b) for attorney’s fees and expenses it incurred in obtaining the consent orders.[1] On June 9, 1982, over Heller’s objection, the bankruptcy court entered an order allowing Stephenson to implement a Plan of Retail Inventory Liquidation. Under the plan, Heller received principal and interest in full, but no costs, expenses and attorney’s fees. Heller again applied for attorney’s fees. The *582 Unsecured Creditors’ Committee[2] contested Heller’s petition, arguing that Heller had failed to comply with a North Carolina statute which provides that attorney’s fee agreements are only enforceable after a creditor gives five days notice to the debtor after default. If the debtor pays within the five day period, the attorney’s fees agreement is void and unenforceable. N.C. Gen.Stat. 6-21.2(5).[3]
Following a hearing, the bankruptcy court found that Heller was an oversecured creditor and was consequently entitled to attorney’s fees under 11 U.S.C. § 506(b). The court overruled the Committee’s objection on the basis that notice in this case would have been futile because Stephenson could not have paid its debt within five days of default. Upon rehearing, the bankruptcy court found that compliance with the state law notice provision was necessary, but that Heller had complied with the law by filing a proof of claim in February of 1982.
The Unsecured Creditors’ Committee then appealed. The district court found that Heller had not complied with the state law notice provision. Heller’s entitlement to attorney’s fees consequently turned on the question of whether, in enacting § 506(b) of the Bankruptcy Code, Congress intended that attorney’s fee agreements should be enforceable in accordance with state law, or notwithstanding contrary state law. The district court found the legislative history of § 506(b) to be inconclusive. Reasoning from the language of the statute and the policies underlying the Code, the court concluded that § 506(b) contemplates that attorney’s fee agreements are only enforceable under the law of the forum state. The court therefore ruled that Heller was not entitled to attorney’s fees because it had failed to comply with the notice requirement under North Carolina law.
Heller now appeals, arguing that the legislative history of § 506(b) of the Bankruptcy Code indicates that Congress intended to abrogate the pre-existing requirement that state law govern the enforcement of attorney’s fee agreements involving over secured claims.
II.
Prior to the enactment of the Bankruptcy Reform Act in 1978, state law clearly governed the enforceability of attorney’s fee agreements between oversecured creditors and bankrupt debtors. ITT Industrial Credit Co. v. Hughes, 594 F.2d 384, 387 (4th Cir.1979); In re Carey, 8 B.R. 1000, 1003 (Bankr.S.D.Cal.1981). In enacting the Bankruptcy Reform Act, Congress considered whether to abrogate the requirement that state law govern such agreements. At various points in the legislative process, Congress changed its mind.[4] The eventual product, § 506(b) of the Bankruptcy Code, is not a model of clarity on this point. It provides that:
To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs or charges provided under the agreement under which such claim arose.
11 U.S.C. § 506(b).
Courts have divided over the interpretation of § 506(b). Under the minority posi *583 tion, § 506(b) is simply a codification of pre-existing law, and consequently state law still governs attorney’s fee agreements. See, e.g., In re Banks, 31 B.R. 173, 175 (Bankr.N.D.Ala.1982); LHD Realty Corp. v. National Life Insurance Co. (In re LHD Realty Corp.), 20 B.R. 722, 725 (Bankr.S.D.Ind.1982); In re Dye Master Realty, Inc., 15 B.R. 932, 935-36 (Bankr.W.D.N.C.1981); In re Sholos, 11 B.R. 782, 784-85 (Bankr.W.D.Pa.1981). Courts endorsing the majority view conclude that under § 506(b) attorney’s fee agreements are enforceable notwithstanding contrary state law. See, e.g., Longwell v. Banco Mortgage Co., 38 B.R. 709, 711 (N.D.Ohio 1984); In the Matter of Scarboro and Garnto, 13 B.R. 439, 442 (D.C.M.D.Ga.1981); In re Virginia Foundry Company, Inc., 9 B.R. 493, 496-97 (D.C.W.D.Va.1981); In re American Metals, 31 B.R. 229, 234-35 (Bankr.D.Kan.1983); In the Matter of Elmwood Farm, Inc., 19 B.R. 338, 341 (Bankr.S.D.N.Y.1982); In re Carey, 8 B.R. at 1002-04; accord, 3 Collier on Bankruptcy, ¶ 506.05 (1984). Some courts adopting the majority view have relied upon the statements of Representative Edwards and Senator DeConcini, the floor managers of the legislation. Immediately prior to the passage of the Act, both told their respective Houses of Congress that:
Section 506(b) of the House amendment adopts language contained in the Senate amendment and rejects language contained in H.R. 8200 as passed by the House. If the security agreement between the parties provides for attorneys' fees, it will be enforceable under title 11, notwithstanding contrary law ...
124 Cong.Rec. 32,398, 33,997 (1978) (emphasis added). See In re Virginia Foundry Company, Inc., 9 B.R. at 496; In re American Metals, 31 B.R. at 234; In re Carey, 8 B.R. at 1004. The statements of these key legislators are entitled to great weight. See K. Klee, Legislative History of the New Bankruptcy Law, 28 DePaul L.Rev. 941, 957-960 (1979);[5] see also N. Singer, 2A Sutherland Statutory Construction § 48.14 at 334-35 (4th ed. 1984). However, in light of the ambiguities in the language and legislative history of § 506(b), we cannot simply assume that the statements of these individual members of Congress are determinative of the intention of the Congress as a whole. Consequently, a more detailed analysis of the legislative history of § 506(b) is in order.
The relevant legislative history of § 506(b) began in the House Judiciary Committee. When the House’s version of the Bankruptcy Reform Act, H.R. 8200, was referred to the committee, § 506(b) read as follows:
To the extent that an allowed secured claim is secured by property whose value is greater than the amount of such claim, there shall be allowed to the holder of such claim interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.
H.R. 8200, 95th Cong., 1st Sess. § 506(b) (July 11, 1977), accompanying H.R.Rep. No. 95-595, 95th Cong., 1st Sess. (1977); reprinted in N. Resnick & E. Wypyski, 12 Bankruptcy Reform Act of1978: A Legislative History, doc. 41 at 79 (1979). H.R. 8200 was amended in committee. One of the changes was an addition to § 506(b) which read, in part, that “there shall be allowed to the holder of such claim to the extent collectible under applicable law interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.” H.R. 8200, 95th Cong., 1st Sess. § 506(b) (Sept. 8, 1977); reprinted in Resnick & Wypyski, supra, vol. 12, doc. 41 at 387 (emphasis added). In the report accompanying H.R. 8200, the House Judiciary Committee explained that
Subsection (b) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees, costs, or charges provided under the agreement under which the claim arose. These fees, costs, and charges are secured claims to the extent that the value of the *584 collateral exceeds the amount of the underlying claim.
H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 356-57 (1977) (emphasis added). When the House first passed H.R. 8200 on February I, 1978, § 506(b) remained in the form in which it had come out of the Judiciary Committee. 124 Cong.Rec. 1, 783-1,804 (1978).
On October 31, 1977, the Senate version of the Bankruptcy Reform Act was introduced and referred to the Senate Judiciary Committee. 123 Cong.Rec. 36,095 (1977). The Senate version of § 506(b) was almost identical to the initial House version. It provided that:
To the extent that an allowed secured claim is secured by property, the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, any reasonable fees, costs, or charges provided under the agreement under which such claim arose.
S. 2266, 95th Cong., 1st Sess. § 506(b) (Oct. 31, 1977); reprinted in Resnick & Wypy-ski, supra, vol. 14, doc. 46 at 86. Senator DeConcini, a member of the Senate Judiciary Committee and co-author of the bill, explained in an accompanying report that § 506(b)
codifies current law by entitling a creditor with an overseeured claim to any reasonable fees (including attorney’s fees), costs, or charges provided under the agreement under which the claim arose. These fees, costs, and charges aare [sic] secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.
5.Rep. No. 95-989, 95th Cong., 1st Sess. 68 (1977) (emphasis added). Section 506(b) remained unchanged as S. 2266 was reported out of both the Senate Judiciary Committee and the Finance Committee. S. 2266, 95th Cong., 2d Sess. § 506(b) (July 14 and Aug. 10, 1978); reprinted in Resnick & Wypy-ski, supra, vol. 17, doc. 53 at 82-83 and 394; see 124 Cong.Rec. 25,305 (1978).
Until early October of 1978, both Houses of Congress continued active consideration of the Bankruptcy Reform Act amid controversy regarding the Article III status of bankruptcy judges. Klee, 28 DePaul L.Rev. at 952-56. As the 95th Congress was drawing to a close, substantial differences remained between the House and Senate versions of the Act. Id. at 953-54. One of those differences was in § 506(b). The House version retained the explicit requirement that state law determine the enforceability of attorney’s fee agreements. The Senate version contained no such language.
The differences between the House and Senate versions of the Act were resolved by the managers of the legislation without a formal conference in late September of 1978. Klee, 28 DePaul L.Rev. at 953-54. As an apparent substitute for a formal conference report, Edwards and DeConcini reported on the compromise bill to their respective Houses of Congress. Using identical language, they explained that the House version had been rejected and the Senate version retained and that, as a result, attorney’s fee agreements would be enforceable “notwithstanding contrary law.” 124 Cong.Rec. 32,398, 33,997 (1978). The Bankruptcy Reform Act, in its final form, passed the Senate on October 5, 1978, 124 Cong.Rec. 33,989-34,019 (1978), and the House on the following day. 124 Cong.Rec. 34, 143-45 (1978).
The confusion that results from the legislative history of § 506(b) arises from the fact that early on in the legislative process both the House and Senate versions of the Act were described as codifying current law,[6] even though the two versions contained different language.[7] Compare H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 356-57 (1977) with S.Rep. No. 95-989, 95th Cong., 1st Sess. 68 (1977). Later the Senate Bill was interpreted as having a con *585 trary meaning even though the Senate language remained the same. Compare S.Rep. No. 95-989, 95th Cong., 1st Sess. 68 (1977) with 124 Cong.Rec. 33,997 (1978) (remarks of Senator DeConcini).
This confusion can be resolved through an examination of the fate of the House version of the bill. The House language that fee agreements “shall be allowed ... to the extent collectible under applicable law” was added to § 506(b) by the House Judiciary Committee. The Committee clearly believed such language was needed in order to explicitly retain the state law requirement. When this version of § 506(b) was initially passed by the entire House, it was with the understanding that the state law requirement would be retained.
When the Bankruptcy Reform Act neared the end of the legislative process in September of 1978, two versions of § 506(b) remained. By this point the Senate had had the opportunity to fine tune many aspects of its version of the bill. See Klee, 28 DePaul L.Rev. at 949-955. Although the Senate had ample opportunity to adopt the language of the House version, it refused to do so. Instead, in the final negotiations which resulted in the compromise bill, see Klee, 28 DePaul L.Rev. at 953-54, the Senate insisted on its version. The Senate explicitly rejected the House language and the House agreed to this significant change. The explicit rejection of-the House language by both Houses of Congress is a clear indication that, under the final version of the Bankruptcy Reform Act, Congress intended that state law should no longer govern the enforceability of attorney’s fee agreements. If Congress had desired to retain this pre-existing requirement, it had the means at its disposal in the form of the House language. That Congress chose to reject that language is an indication that Congress chose to reject the pre-existing law. The statements of Representative Edwards and Senator De-Concini that, under the final version of the Act, fee agreements are enforceable “notwithstanding contrary law,” 124 Cong.Rec. 32,389, 33,997 (1978), consequently reinforce an interpretation of congressional intent behind § 506(b) which is apparent from the legislative process itself.[8]
In sum, we conclude that, in rejecting the House version of § 506(b), Congress intended to abrogate the pre-existing requirement that attorney’s fee agreements were enforceable only in accordance with state law. Such agreements are now enforceable notwithstanding contrary law. Consequently, Heller is entitled to enforcement of its attorney’s fee agreement despite its failure to comply with the North Carolina notice requirement.[9] Accordingly, we reverse the judgment of the district court and remand the case to the bankruptcy court for an award of attorney’s fees.
REVERSED.

. Heller sought attorney’s fees and expenses in the amount of $5,101.69.

. The Unsecured Creditors’ Committee consists of unsecured creditors of Stephenson.

. N.C.Gen.Stat. § 6-21.2(5) provides that the holder of a secured note or his or her attorney
shall, after maturity of the obligation by default or otherwise, notify the maker, debtor, account debtor, endorser or party sought to be held on said obligation that the provisions relative to payment of attorneys’ fees in addition to the "outstanding balance" shall be enforced and that such maker, debtor, account debtor, endorser or party sought to be held on said obligation has five days from the mailing of such notice to pay the "outstanding balance” without the attorneys' fees. If such party shall pay the “outstanding balance” in full before the expiration of such time, then the obligation to pay the attorneys’ fees shall be void, and no court shall enforce such provisions.

.See infra at 583-84.

. This article also appears in 54 Am.Bankr.LJ. 275 (1980).

. As discussed supra, under current law at the time the Act was considered, state law governed the enforceability of attorney’s fee agreements.

. See In re Carey, 8 B.R. at 1004 n. 5.

. In his concurrence, Judge Widener states that he would interpret § 506(b) differently because he would rely exclusively upon the Report of the Senate Judiciary Committee which described § 506(b) as "codify[ing] current law." S.Rep. No. 95-989, 95th Cong., 2d Sess. 68 (1978). The Senate Report was issued several months before the full Senate rejected a version of § 506(b) which would have made fee awards enforceable "to the extent collectible under applicable law." H.R. 8200, 95th Cong., 2d Sess. (1978). When there is a conflict between what a Senate Committee says at one point in time, and what the full Senate does at a later date, the actions of the Senate as a whole must govern. See N. Singer, 2A Sutherland Statutory Construction § 48.04 (4th Ed.1984).

. We reject the argument of the Unsecured Creditors’ Committee that N.C.Gen.Stat. § 6-21.-2(5) is not "contrary law.” The North Carolina statute, supra n. 3, contemplates that a creditor give a debtor five days notice after default. Id. If the debtor pays the amount in default within the five day period, attorney’s fees cannot be collected against the debtor even if an agreement between the creditor and debtor provides for the payment of fees. ITT-Industrial Credit Co., 594 F.2d at 387 n. 5. Because the purpose of the North Carolina statute is to make attorney's fee agreements unenforceable in certain circumstances, the statute clearly constitutes "contrary law.”