In re MORSE TOOL, INC., Debtor.

David FERRARI, Trustee of Morse
Tool, Inc., Plaintiff,

v.

BARCLAYS AMERICAN/BUSINESS
CREDIT, INC., Defendant,

v.

GULF & WESTERN, INC.,
Third–Party Defendant.

Bankruptcy No. 87–10588–CJK.
Adv. No. 87–1303.

United States Bankruptcy Court,
D. Massachusetts.

June 7, 1988.

Charles Bennett, Boston, Mass., for defendant.

Gene Landy, Boston, Mass., for plaintiff.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO TERMINATION CHARGE

CAROL J. KENNER, Bankruptcy Judge.

These motions arise in a contest over proceeds from the sale of the Debtor's assets. In June, 1987, an order authorizing the sale of substantially all of the Debtor's operating assets was entered. The order contemplated that all debts secured by the assets would be paid in full from the proceeds. The Defendant, Barclays American/Business Credit, Inc. ("Barclays"), holds a security interest in the proceeds. Pursuant to a procedure established in the order, the Creditors' Committee timely objected to Barclays' secured claim. The objection initiated a "contested matter" under Bankruptcy Rule 9014, but for ease of administration and because the objection contained a request to subordinate a claim, the contested matter has been converted pursuant to Bankruptcy Rule 7004(c) into an adversary proceeding under Part VII of the Bankruptcy Rules. By the parties' stipulation, the Creditors' Committee has been dropped as a party and replaced by the Chapter 7 Trustee, David Ferrari (the "Trustee").

Barclays claims that it is entitled to be paid out of the proceeds of the sale for, among other things, a charge for $173,-096.16 under its loan agreement with the Debtor for the Debtor's early termination of the loan. The Trustee's objection challenges the validity, the priority, and implicitly, the amount of Barclays' secured claim to the early termination charge. The Trustee has filed a motion for partial summary judgment, seeking an order disallowing or subordinating the early termination charge portion of Barclays' claim. Barclays opposes the Trustee's motion and has filed a cross-motion for partial summary judgment seeking allowance of the early termination charge portion of its claim.

Both parties submitted briefs and reply briefs. I have heard their oral arguments.

The evidence before me consists only of the Affidavit of Timothy J. Broderick, which was submitted by Barclays, and of the documents that constitute the loan agreement itself, which were submitted by the Trustee. The Trustee submitted no affidavit authenticating the loan documents, but Barclays' counsel stipulated to the documents' authenticity during oral argument.

The early termination charge is part of a loan agreement between Barclays and the Debtor. Barclays agreed to lend the Debtor approximately $3,800,000. The loan agreement was memorialized in two documents, the "General Loan and Security Agreement" and the "Overall Rider to General Loan and Security Agreement and Related Documents." Both documents were dated August 24, 1984. Paragraph 14 of the General Loan and Security Agreement defined the term of the loan as follows:

> This Agreement shall continue in full force and effect until three years from the date hereof (Initial Contract Period) unless terminated by Debtor or Lender at the expiration of the Initial Contract Period or on any yearly anniversary thereafter (Normal Termination Date). Termination shall. be effected by the mailing of a Certified Letter, Return Receipt Requested, of Notice, addressed by either party to the other and the termination shall be effective as of the Normal Termination Date provided at least 60 days prior written notice shall have been given. Upon the Normal Termination Date, all obligations created under this Agreement and at Lender's option all obligations under any other agreement between Debtor and Lender, shall be due and payable.

From this paragraph, it appears that both parties had the option of terminating the loan agreement without charge on the third anniversary of its making, August 24, 1987, the expiration date of the Initial Contract Period. The agreement would automatically continue in effect thereafter for

an indefinite number of one-year intervals unless one party elected to terminate it and properly notified the other of that election. Termination could occur only on August 24, 1987, or on an anniversary of that date.

The Debtor agreed to pay "interest upon the net balance due [Barclays] at the close of business each day, at a rate equal to three and one-half percent per annum over the highest announced prime loan interest rate in effect at the close of business on such day" at three specified banks. The lowest interest rate that could be paid on any given day was set at ten percent. The agreement also contained a "Minimum Charge" provision:

> As compensation for the granting of a line of credit and continuing commitment to credit availability, Debtor agrees that notwithstanding the charges computed under paragraph 7 of this agreement [which specifies the interest charges] and the actual net balance due [Barclays] at the close of business each day, all charges will be at least Twenty Thousand Eight Hundred Thirty–Three and 00/100 Dollars ($20,833.00) per calendar month during the term of this Agreement unless and until this Agreement is terminated.

Therefore, the agreement provided that as long as the loan agreement were not terminated, the Debtor would have to pay Barclays at least $20,833 per month, even for months during which the Debtor's balance would be zero.

The early termination charge is provided for in paragraph 1.15 of the "Overall Rider." Paragraph 1.15 states that the Debtor has the option of terminating the loan agreement early, provided that it gives Barclays ninety (90) days written notice of the termination and, in addition to satisfying all its other obligations to Barclays, pays as "liquidated damages" a "termination charge", plus all Barclays' costs and expenses relating to the termination. Paragraph 1.15(b) sets forth how the termination charge is to be calculated. If the agreement were terminated between August 24, 1984, and August 23, 1985, the termination charge would be five percent (5%) of the Average Balance; if between

August 24, 1985 and August 23, 1986, four percent (4%) of the Average Balance; and if between August 24, 1986 and the end of the initial contract period (that is, August 24, 1987—see paragraph 14 of the General Loan and Security Agreement), three percent (3%) of the Average Balance. The Average Balance is defined as "the highest average monthly loan balance, exclusive of loans evidenced by promissory notes, outstanding during the twelve (12) months immediately preceding the Optional Termination Date." Paragraph 1.15 further provides that if termination occurs on a Normal Termination Date (any yearly anniversary of the end date of the initial contract period), no termination charge shall be payable.

One other provision of the General Loan and Security Agreement is relevant to these motions: the stipulation as to governing law. The parties agreed that the agreement "shall be governed as to validity, enforcement and in all other respects by the laws of the State of Connecticut."

With the proceeds from the sale of its operating assets, the Debtor paid off and terminated the Barclays loan on June 16, 1987, two months and eight days before the end of the Initial Contract Period, when the agreement could have been terminated without charge. The Debtor's payment to Barclays included payment for an early termination charge of $173,097.67. Neither party disputes that this figure represents a proper calculation of the charge pursuant to the formula in paragraph 1.15 of the Overall Rider.

## DISCUSSION

The Trustee has invoked three laws, or sets of laws, against Barclays' early termination charge: the requirements of Connecticut contract law regarding penalties and liquidated damages; the requirement of 11 U.S.C. § 506(b) that charges allowed thereunder be reasonable; and the requirements of 11 U.S.C. §§ 724(a) and 726(a)(4) that liens securing a penalty be voided and that the penalties themselves be subordinated. The Court will deal with each of

these in turn, but must first deal with Barclays' argument, consistent with the holding in *Matter of 268 Limited,* 789 F.2d 674, 675–677 (9th Cir.1986), that a charge that comports with the requirements of § 506(b) must be allowed "notwithstanding contrary [state] law." *Id.* at 676.

*Applicability of State Law*

Section 506(b) states—

To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim ... any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

This section places only three express conditions on the allowance of charges within its purview: that the claim be oversecured, that the charge be reasonable, and that the charge be provided for under the agreement that gave rise to the claim. Section 506(b) does not expressly require that the charges also be valid under applicable state law; rather, it says simply that the charges that meet the three express conditions "shall be allowed." Therefore, standing alone, § 506(b) appears to override any contrary state law regarding the validity of the charges.

Section 506(b), however, does not stand alone. It must be read in conjunction with the remainder of the Bankruptcy Code. As a general rule, the Code requires that the validity of claims be determined according to non-bankruptcy law. The Code defines a "claim" as a "right to payment," 11 U.S.C. § 101(4), and requires the Court, upon objection, to disallow claims to the extent that they are unenforceable "under any agreement or applicable law." 11 U.S.C. § 502(b)(1). See *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–918, 59 L.Ed.2d 136 (1979) (a case under Chapter XI of the Bankruptcy Act) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law".)

Section 506(b) does not expressly override § 101(4) and § 502(b)(1). It can be interpreted either as implicitly overriding those two sections, thereby creating an implicit exception to the general rule that the validity of a claim is governed by state law, or as merely supplementing them. Courts disfavor the creation of exceptions by implication. "Exceptions to clearly delineated statutes will be implied only where essential to prevent 'absurd results' or consequences obviously at variance with the policy of the enactment as a whole." *United States v. Rutherford,* 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979). "Only when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributable to congressional design will an exception to statutory language be judicially implied." *Id.* Here, it would not create absurd or unreasonable results to read § 506(b) literally, as merely supplementing the general rule stated in § 101(4) and § 502(b)(1). The result would be that a secured party could recover a charge that comes within the purview of § 506(b) only if the charge were both valid under state law and reasonable within the meaning of § 506(b). Therefore, I conclude that the § 506(b) reasonableness requirement does not create an exception to the requirement that the validity of claims should be determined under applicable state law. Rather, § 506(b) creates a supplemental requirement that the charge be reasonable.

Two other courts and one commentator, all relying on the legislative history of § 506(b), have concluded otherwise—that reasonable attorney's fees and costs that are agreed to by contracting parties should be allowed an oversecured claimant regardless of contrary law. *Matter of 268 Limited,* 789 F.2d 674, 675–677 (9th Cir.1986); *In re Carey,* 8 B.R. 1000, 1002–1004 (Bankr.S.D.Cal.1981); 3 *Collier on Bankruptcy* ¶ 506.05 (15th ed. 1988) at 506–49. I need not recount here the entire legislative history on which these authorities rely. See *In re Carey, supra,* at 1003–1004, and *Matter of 268 Limited, supra,* at 676–677, for that purpose. Both courts relied upon statements made by the floor managers of the Bankruptcy Reform Act of 1978, in which § 506(b) was enacted. With respect to that

subsection, Representative Edwards and Senator De Concini said that, "[i]f the security agreement between the parties provides for attorney's fees, it will be enforceable under Title 11 *notwithstanding contrary law.*" 124 Cong.Rec. H11095 (daily ed. September 28, 1978) (emphasis added); see also 124 Cong.Rec. S17411 (daily ed. October 6, 1978). From these statements, the courts and commentator concluded that the words "notwithstanding contrary law" represented the intent of the Congress and, as such, should dictate our interpretation of § 506(b).

■ I think it is a mistake to decide this issue on the basis of the floor managers' remarks. A court should not invoke legislative intent to interpret a statute where that statute is unambiguous and where compliance with the statute would not produce absurd results. *In re George Rodman, Inc.*, 792 F.2d 125, 128 (10th Cir. 1986); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 106–107 (D.C. Cir.1976); *Peare v. McFarland*, 577 F.Supp. 791, 794 (D.Ind.1984), *aff'd* 778 F.2d 354 (7th Cir.1985). No court should look behind an unambiguous statute for a contrary intent because, by using the contrary intent as a guide, the court would be favoring the unenacted history over the statute itself. Therefore, the plainer the language of the statute, the more convincing the contrary legislative history must be to overcome it. *Peare v. McFarland, supra.* In this case, the statute (sections 101(4), 502(b)(1) and 506(b) of the Bankruptcy Code) is relatively clear; its ambiguity can be eliminated with rudimentary principles of statutory interpretation, as was demonstrated above. The legislative history, on the other hand, is unconvincing and less reliable than the statute itself.

■ The legislative history reveals that although the House and the Senate used different phraseology in their original versions of § 506(b),[1] the reports of both chambers indicated that the language used was intended to preserve the status quo—that § 506(b) would not supplant state law as to the validity of contracts for attorney's fees. The differences were worked out without formal conference, and, in its final version, § 506(b) incorporated the phraseology of the Senate bill. See *In re Carey, supra,* at 1003; *Matter of 268 Limited, supra,* at 676. One would normally assume that where the language had not changed, neither had the intent behind it. The force of this assumption makes it hard to attach much weight or credibility to the floor managers' statements that, under the final version of § 506(b), fee arrangements would be enforceable "notwithstanding contrary law."[2]

One can not easily conclude that the legislature intended that under § 506(b), contractual fees, costs and charges would be enforceable notwithstanding contrary state law. I conclude that the floor managers' statements are unreliable indicia of legislative intent and that the best record of legislative intent in this case is the statute itself. Interpreted in light of standard rules of statutory interpretation, § 506(b) does not supplant state law; rather, it supple-

---

**1.** The House version stated "[t]here shall be allowed to the holder of such claim, to the extent collectible under applicable law interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which the claim arose." The Senate bill omitted the phrase, "to the extent collectible under applicable law." *Matter of 268 Limited, supra,* at 676.

**2.** I find it easier to believe that the floor manager misspoke than that their statements correctly reflected the intent of the legislature as a whole. Even under the best of circumstances, legislative intent is difficult to define and to ascertain. See *Edwards v. Aguillard,* — U.S. ——, 107 S.Ct. 2573, at 2605–2607, 96 L.Ed.2d 510 (1987)

(Scalia, J. dissenting) for a fuller discussion of this problem. Here, we do not know whose intentions the floor managers were expressing when they made their statements. Nor do we have good reason to impute the floor managers' (and perhaps certain committee members') intentions to the legislature as a whole. Moreover, too many questions remain unanswered to credit the floor managers statements: why would both Houses of Congress change their intentions? If they did change their intentions, why would they not also change the wording of § 506(b) to reflect and clarify their intentions? How could the same wording have two diametrically opposed meanings to the same legislators?

ments state law, so that a charge within the purview of § 506(b) must be enforceable under applicable state law, as § 502(b)(1) requires, *and* must be reasonable within the meaning of § 506(b).

Therefore, I turn first to the requirements of state law. The agreement between Barclays and the Debtor provides that it "shall be governed as to the validity, construction, enforcement and in all other respects by the laws of the State of Connecticut," so I must look to Connecticut law.

*Connecticut Law*

In Connecticut, the courts will enforce liquidated damages provisions if they satisfy three conditions: (1) at the time the contract was made, the damages expected as a result of a breach of contract were uncertain in amount or difficult to prove; (2) the parties intended to liquidate damages in advance; and (3) the amount stipulated was "reasonable." That is, it was not greatly disproportionate to the amount of damage which, as the parties looked forward, it seemed that the injured party would sustain in the event of a breach. *Hanson Development Company v. East Great Plains Shopping Center*, 195 Conn. 60, 485 A.2d 1296, 1299–1300 (1985) (hereinafter "Hanson"); *Norwalk Door Closer Co. v. Eagle Lock & Screw Co.*, 153 Conn. 681, 220 A.2d 263 (1966) (hereinafter "Norwalk"). The Connecticut courts, however, will not allow the damaged party to recover both liquidated damages and actual damages, *Hanson, supra*, 485 A.2d at 1299; nor will they enforce a liquidated damages provision where, although the contract has been breached, the breach caused no damage. *Norwalk, supra*, 220 A.2d at 268. The burden of proving that no damages were suffered falls on the party seeking to avoid the award of liquidated damages. *Id. Norwalk, supra*, 220 A.2d at 268. Provisions that impose a penalty for breach of contract are deemed invalid, *Hanson, supra*, 485 A.2d at 1299; *King Motors v. Delfino*, 136 Conn. 496, 72 A.2d 233 (1950); and the injured party's recovery under such clauses will be limited to actual damages. A penalty provision is one which,

instead of specifying the sum that the parties in good faith agreed on as representing the damages that would ensue from breach, was inserted in the contract to deter a party from breaching the contract and to penalize the party for doing so. *King Motors v. Delfino, supra; Berger v. Shanahan*, 118 A.2d 311, 142 Conn. 726 (1955).

*Section 506(b)*

■ Over and above the requirements of Connecticut law, Barclays' early termination charge must meet the reasonableness standard under Bankruptcy Code § 506(b). Section 506(b) limits the secured party's recovery to "reasonable" fees, costs or charges. The courts have interpreted reasonable to mean actual and necessary. *In re American Metals Corp.*, 31 B.R. 229, 237 (Bankr.D.Kan.1983); *In the Matter of Lane Poultry of North Carolina*, 63 B.R. 745, 749 (Bankr.M.D.N.C. 1986); *In re Banks*, 31 B.R. 173, 178 (Bankr.N.D.Ala.1982). Therefore, although a liquidated damages charge may be reasonable and valid under Connecticut law because it was a reasonable estimate of the damages anticipated when the contract was made, that same charge will be valid and enforceable under § 506(b) only to the extent that the secured party actually incurred damages. Thus, if Barclays' actual damages were less than the amount provided for in the liquidated damages clause, Barclays' recovery would be limited to the amount of damages actually sustained. See *In re Baker*, 49 B.R. 240, 243 (Bankr.E.D.Pa.1985) (a contract clause setting attorney's fees as a percentage of the principal indebtedness, although valid under state law, will be allowed under § 506(b) only to the extent that there is evidence of the need for, and the value of, the services provided). If the amount provided for in the liquidated damages provision is unreasonably high, § 506(b) does not render the clause *entirely* invalid and unenforceable as a penalty, as may be the law in some states. Rather, § 506(b) requires that the clause be enforced, but only to the extent that the secured party suffered actual and necessary damages. *In re Skyler Ridge*, 80 B.R. 500, 16 B.C.D. 1122, 1126 (Bankr.C.D.Cal.1987).

*Motions for Summary Judgment*

■ This case is here on cross motions for summary judgment, so the issue before me is whether the evidence submitted by the parties shows that there are genuine issues as to material facts. At least two genuine issues of material fact prevent me from allowing Barclays' motion. First, there is a genuine issue under Connecticut law as to whether the contractual formula for approximating liquidated damages—the early termination charge—constituted a reasonable estimate as of the time the contract was made of the damages that could be anticipated if the loan agreement were terminated early. The reasonableness of the early termination charge is thrown into question by the minimum charge provision. From the evidence submitted, a fact finder can (but need not) infer that the minimum charge and the early termination charge provisions serve much the same purposes: to insure recoupment of transaction costs and to insure against lost profits.[3] Nonetheless, the two provisions use very different formulas for accomplishing these purposes.

The minimum charge provision simply requires that the Debtor be charged at least $20,833 during each month of the agreement, even when actual interest and other charges are less than that amount. The early termination charge, on the other hand, levies a charge fixed at three percent of the highest average monthly balance during the twelve months preceding the termination date. Had it been used here, the minimum charge formula would have cost the Debtor only $47,290.91 (two months and eight days at $20,833.00 per month). The early termination charge, on the other hand, has been calculated as $173,097.67.

I have no evidence with which to evaluate the intrinsic reasonableness of either formula. Nonetheless, where two formulas, both apparently intended by the parties to serve the same purposes, result in a difference in liquidated damages of $125,-806.76, I must find that there is a genuine issue of material fact about the reasonableness of the more expensive formula.[4]

■ Second, I must deny Barclays' motion for another reason: Barclays has adduced little or no evidence of the amount of actual damages it suffered as a result of the Debtor's early termination. Under § 506(b), Barclays bears the burden of proving that the amount it seeks represents actual damages incurred. Without such evidence, I must deny Barclays' motion.

I next turn to the Trustee's motion. In essence, the Trustee argues that the early termination charge is a penalty and is unreasonably high; therefore, the charge should be disallowed in its entirety. This argument does not satisfy the requirements of § 506(b) and of Connecticut law. Under both § 506(b) and Connecticut law, Barclays' is entitled to recover as much of the early termination charge as represents actual damages suffered. The only condition under which Barclays would recover nothing under § 506(b) or Connecticut law would be if it suffered no actual damages. Thus, on the Trustee's motion for summary judgment, the issue is whether the evidence submitted creates a genuine issue of material fact as to whether Barclays incurred actual damages from the Debtor's early termination.

I find that the evidence regarding actual damages is thin and ambiguous and thus creates a genuine issue of material fact.

**3.** "The usual purpose of a prepayment premium provision in a loan agreement is to assure that the lender will receive the contractual rate of return for the life of the loan, or the equivalent thereof." *In re Skyler Ridge, supra,* 80 B.R. 500, 16 B.C.D. at 1125. The minimum charge provision in the Barclays loan agreement said that the minimum charge was "compensation for the granting of a line of credit and continuing commitment to credit availability."

**4.** This should not be construed as a finding that the minimum charge provision would qualify as "reasonable" under § 506(b). I only find that the minimum charge provision is evidence that creates a genuine issue of material fact about the reasonableness of the early termination charge.

Therefore, I must deny the Trustee's motion.[5]

Accordingly, the parties' cross-motions for partial summary judgment are hereby denied.

See also 71 B.R. 221.

---

**5.** I can not decide how much of the early termination charge should be subordinated under 11 U.S.C. § 726(a)(4), and how much of the lien should be avoided under 11 U.S.C. § 724(a), where there is an issue of material fact as to how much of the early termination charge constitutes compensation for actual damages. To the extent that the charge constitutes compensation for actual damages, it can not constitute a penalty. Therefore, I need not at this juncture address the Trustee's arguments under § 724(a) and § 726(a)(4).