In re **DURALITE TRUCK BODY & CONTAINER CORP.,** Debtor.

In re **TRUCK EQUIPMENT SALES AND SERVICE, INC.,** Debtor.

Bankruptcy Nos. 90–5–0199–SD, 89–5–4456–SD.

United States Bankruptcy Court, D. Maryland.

March 31, 1993.

Robert D. Harwick, Karen R. Wilkowsky, Thieblot, Ryan, Martin & Ferguson, P.A., Baltimore, MD, for Chapter 7 Trustee.

Michael J. Schwarz, Schwarz & Greenblatt, Baltimore, MD, for debtor.

Stephen M. Goldberg, Shoshana Katz, Weinberg & Green, Baltimore, MD, for Fidelcor Business Credit Corp.

Kathleen M. Miko, Karen C. Bunting, Hogan & Hartson, Bethesda, MD, for Sovran Bank/Maryland.

Stephen A. Goldberg, Gallagher, Evelius & Jones, Baltimore, MD, for John F. Smith.

## MEMORANDUM OPINION ON OBJECTIONS TO FIDELCOR SECURED CLAIM

E. STEPHEN DERBY, Bankruptcy Judge.

### I. *The Issue.*

The principal issue presented for decision is whether an oversecured creditor is entitled to collect a prepayment charge calculated according to a contractual formula, after the creditor has foreclosed. Debtors, the Chapter 7 Trustee, Sovran Bank/Maryland (Sovran) and John F. Smith object to, and move for turnover of, the prepayment charge asserted by Fidelcor Business Credit Corporation (Fidelcor) under its loan agreement with the Debtors, Truck Equipment Sales and Service, Inc. (Tessi) and Duralite Truck Body & Container Corp. (Duralite). Sovran is a subordinated secured creditor, and John Smith is a creditor, a guarantor, and an equity principal of Tessi.

Fidelcor argues that it is entitled to the prepayment charge if that charge would be allowed under state law governing the contract. The Debtors, the Trustee, Sovran and Mr. Smith argue that the court must assess the reasonableness of the claim without regard to state law. The objectors also contest the reasonableness of Fidelcor's collection costs.

The court concludes that the prepayment charge must satisfy federal reasonableness standards under 11 U.S.C. § 506(b). Further, the court will require the reasonableness of the collection costs to be demonstrated.

### II. *The Facts.*

These Chapter 7 cases involve two affiliated debtors: Tessi and Duralite. Although the cases are separate, they have similar histories and have identical motions pending.

On August 17, 1989, Debtors entered into a $2,500,000 revolving loan agreement with Fidelcor, with interest at a floating rate of 4% over the prime rate on outstanding principal balances. To secure the loan, the parties executed three security agreements that granted Fidelcor a security interest in the Debtors' accounts, inventory, equipment, and proceeds thereof. Pursuant to the first security agreement governing accounts, all obligations were due on demand (¶ 23), and the term of the agreement was two years, automatically renewed for one year periods if not terminated by a party (¶ 26). Paragraph 30 of the first security agreement provided for a prepayment charge in the event of early payment, breach or default.

> Debtor may, on five days' notice, prior to the end of any calendar month, prepay and terminate this Security Agreement by paying to [Fidelcor] in cash or certified check, the entire unpaid principal balance plus accrued charges, fees and other sums due hereunder or under the Financing Agreements, together with a sum equal to 50% of the average monthly charges for the immediately preceding six months or from the date of the agreement whichever is less, multiplied by the number of months of the unexpired balance of the initial contract term or any renewal term of this agreement but in no event less than $150.00 per month for each month of the unexpired term. In the event of a breach or default by the debtor hereunder the parties agree that damages sustained by [Fidelcor] shall be computed as provided for in this paragraph. Prior to actual receipt of moneys due under this paragraph, [Fidelcor] may at its option exercise all of its rights under the Security Agreement.

Tessi filed for Chapter 11 protection on December 28, 1989, and Duralite filed on January 16, 1990. On motion of the U.S. Trustee, both cases were converted to Chapter 7 on May 14, 1990. Promptly after the cases were filed, Fidelcor moved for relief from the automatic stay to liquidate the inventory and accounts receivable. With the consent of Debtors, the court granted the motions. By supplemental order, the court, *sua sponte*, directed Fidelcor to file a report of disposition.

Fidelcor's Report of Disposition of Collateral disclosed total receipts of $646,613.74. This amount was sufficient for Fidelcor to satisfy fully its outstanding principal of $464,202.44 and interest of $23,235.77. After deducting principal and interest, $159,175.53 remained. However, Fidelcor asserted a claim for collection expenses in the amount of $274,898.59, and it therefore reported a remaining balance due of $115,723.04.

The claimed expenses include a prepayment charge of $164,164.75. Fidelcor calculated this prepayment charge by averaging the total interest earned on its loan over the five month period from August, 1989 to December, 1989, multiplying that number by the number of months of the remaining term of the loan, and dividing that number by two. Fidelcor used 19 months as the remaining term of the loan. The court, however, disagrees with Fidelcor's computation of its claim. Under paragraph 26 of the first security agreement, the remaining term of the loan was the balance of a one year renewal period, namely, seven months beginning with January, 1990. This adjustment reduces Fidelcor's prepayment charge claim to $60,481.75.

After filing the report, Fidelcor moved for an order fixing time for objections to it. In response, Debtors moved for a denial of Fidelcor's claim for expenses and for turnover to the bankruptcy estate of $159,175.53. John F. Smith filed a similar motion that asserted Fidelcor's expenses were inherently unreasonable under 11 U.S.C. § 506(b). He argued that expenses amounting to 56% of the debt and a prepayment penalty amounting to 34% of the debt are excessive on their face. Mr. Smith pointed out that Fidelcor's collection efforts occupied only eleven weeks, and he highlighted certain specific expenses that he objected to as unreasonable or unjustified. Because Mr. Smith conceded that Fidelcor is entitled to reasonable expenses of 10%, his turnover request is limited to $112,755.29.

Fidelcor has objected to Mr. Smith's standing as an unsecured creditor, to bring a turnover action. Because the Trustee has objected and sought a turnover as the acknowledged representative of the bankruptcy estate, it is not necessary to reach the question of Mr. Smith's standing. The Trustee's objections and motion permit the court to rule on the merits of Fidelcor's expense claims.

The Chapter 7 Trustee's objection and motion for a turnover and for an accounting primarily challenge the prepayment charge as a penalty that is unrelated to Fidelcor's damages. The Trustee also adds attorneys fees to Mr. Smith's objections to specific expenses. Finally, Sovran joined in the Trustees's objection and motion for turnover; but Sovran asserted that the monies recovered by the Trustee should immediately be distributed to it as the subordinated lienholder on the collateral.

### III. *Discussion.*

Fidelcor must defend its prepayment charge under Bankruptcy Code 11 U.S.C. § 506(b). The section provides:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any *reasonable* fees, costs, or charges *provided for under the agreement* under which such claim arose.

11 U.S.C. § 506(b) (emphasis added).

■ The concept of "charge" as used in § 506(b) encompasses prepayment charges. *In re A.J. Lane & Co., Inc.,* 113 B.R. 821, 823 (Bankr.D.Mass.1990). The section, however, requires that any such additional charges be reasonable. Fidelcor urges the court to adopt a state law standard of reasonableness, while the Debtors, creditors and Trustee urge a uniform federal standard.

### A. Validity of the Prepayment Charge under New York Law.

■ Pursuant to a choice of law provision in paragraph 27 of the first security

agreement, disputes between Fidelcor and the debtors are governed by New York law. Fidelcor's prepayment charge is essentially a liquidated damages provision. Liquidated damages provisions are enforceable in New York, if "(1) actual damages may be difficult to determine and (2) the sum stipulated is not 'plainly disproportionate' to the possible loss." *Walter E. Heller & Co. v. American Flyers Airline Corp.,* 459 F.2d 896, 899 (2d Cir.1972) (citing state law authority). See also *Truck Rent–A–Center v. Puritan Farms 2nd,* 41 N.Y.2d 420, 393 N.Y.S.2d 365, 369, 361 N.E.2d 1015, 1018 (1977). Unless a prepayment premium satisfies both of these requirements, it is an unenforceable penalty. *Truck Rent–A–Center,* 393 N.Y.S.2d 365, 369, 361 N.E.2d 1015, 1018. "The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable. [citations omitted]. It thus makes no difference whether the actual damages are ultimately higher or lower than the sum stated in the clause, . . . ." *American Flyers Airline Corp.,* 459 F.2d at 898–99. *Accord, In re United Merchants & Mfrs., Inc.,* 674 F.2d 134, 143 (2nd Cir.1982). Therefore, an analysis of actual damages is immaterial.

Federal courts interpreting New York law have recognized several factors that may justify prepayment charges because they render determination of potential damages in large commercial loans difficult. These factors include: loss of interest to which a lender was entitled; contractual limits on lending activities to insure adequate funds will be available to the borrower when needed; costs incurred procuring substitute borrowers together with the attendant risks and delay; and the ability to realize on the collateral. *American Flyers Airline Corp.,* 459 F.2d at 899–900; *In re Financial Center Associates of East Meadow, L.P.,* 140 B.R. 829, 836 (Bankr. E.D.N.Y.1992). In addition, courts have relied upon evidence of arms-length negotiation between sophisticated parties represented by counsel. See, *e.g., United Mer-*

*chants & Mfrs., Inc.*, 674 F.2d at 137; *American Flyers Airline Corp.*, 459 F.2d at 899–900. The determination is tested as of the time the agreement is made, and not at the time of prepayment.

■ In this case, when the loan agreements were signed, Fidelcor could anticipate a potential loss of interest income if the Debtors prepaid their loan. Because of the revolving nature of the loan arrangement, Fidelcor was required to limit lending activities in order to be capable of meeting debtors' loan requests. Fidelcor could also anticipate additional costs and expenses if it was required to find a substitute borrower. Finally, the transaction was negotiated at arms-length by sophisticated parties. Damages from breach of the loan were difficult to determine at the time the contract was signed, and each party voluntarily assumed the contractual benefits and burdens. Invalidating the contractual prepayment premium would therefore interfere with the parties' expectations and their freedom to contract. See *In re Financial Center Associates*, 140 B.R. at 838. Consequently, the court concludes that the liquidated damages provision in this case would likely be upheld under New York law. However, state law is not controlling under 11 U.S.C. § 506(b). See *In re Consolidated Properties Limited Partnership*, 152 B.R. 452, 456–57 (Bankr.D.Md.1993).

## B. History of Section 506(b).

Before enactment of the Bankruptcy Reform Act in 1978, attorneys' fee charges in mortgage notes were subject to a determination of validity under state law. *Security Mortgage Co. v. Powers*, 278 U.S. 149, 153–154, 49 S.Ct. 84, 85–86, 73 L.Ed. 236 (1928) (Supreme Court recognized the legitimacy of applying a Georgia statute which required suit to collect under attorney fee clause in mortgage note); *ITT–Industrial Credit Co. v. Hughes*, 594 F.2d 384 (4th Cir.1979) (court affirmed bankruptcy court which had applied North Carolina statue imposing notice requirement for collecting attorneys' fees under clause in mortgage note). Neither the Bankruptcy Act of

1898, nor the Bankruptcy Rules that implemented the Act, contained express provisions relating to the allowance of attorneys' fees, costs or charges. See Bankruptcy Act of 1898, § 57h; Bankruptcy Rule 306(d) (1973). Therefore, the determination whether fees, costs or charges would be recognized was left to state law and to the inherent equitable powers of the bankruptcy court to determine what claims should be paid. *ITT–Industrial Credit Co. v. Hughes*, 594 F.2d at 386.

The Bankruptcy Reform Act of 1978 included a specific provision allowing recovery of "any *reasonable* fees, costs, or charges provided for under the agreement". 11 U.S.C. § 506(b) (emphasis added). The inclusion of the reasonableness requirement indicated Congressional intent to impose a federal standard on recovery of contractual fees, costs, and charges. *In re A.J. Lane & Co., Inc.*, 113 B.R. at 824. "To give § 506(b)'s limitation meaning, we must read it to provide for an *ex post* reasonableness determination by the bankruptcy court." *Matter of 268 LTD*, 789 F.2d 674, 676 (9th Cir.1986). The statute is silent, however, as to whether a claim for charges must still be valid under applicable state law. Fees, costs, and charges must be provided for under the loan agreement, but the language and legislative history of § 506(b) provide little additional guidance.

An early version of § 506(b) in the House of Representatives allowed reasonable attorney's fees "to the extent collectible under applicable law." H.R. 8200, 95th Cong., 1st Sess. (1977). By contrast, the Senate version omitted this language. S.2266, 95th Cong., 1st Sess. (1977). Both the House and Senate Judiciary Committee Reports stated, "Subsection (b) codifies current law", despite each containing different statutory language. *Compare* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 356–57 (1977) *with* S.Rep. No. 95–989, 95th Cong., 2nd Sess. 68 (1978) [U.S.Code Cong. & Admin.News pp. 5787, 5854, 6311–6513]. Adding further confusion, Representative Edwards and Senator De Concini, floor managers of the Bankruptcy Reform Act of 1978, stated that "if the security agreement between the parties provides for *at-*

*torneys' fees,* it will be enforceable under Title 11 *notwithstanding contrary law."* 124 Cong.Rec. H11095 (1978); See also 124 Cong.Rec. S17411 (1978) (emphasis added).

The Fourth Circuit Court examined the legislative history of § 506(b) to determine whether state or federal law controls an award of attorneys' fees to an oversecured creditor, and concluded that federal law controlled. *Unsecured Creditors' Committee v. Walter E. Heller & Company,* 768 F.2d 580 (4th Cir.1985). Attorneys' fee agreements were held enforceable under § 506(b) notwithstanding contrary state law. The court stated:

> [W]e conclude that ... Congress intended to abrogate the pre-existing requirement that attorney's fee agreements were enforceable only in accordance with state law. *Such agreements are now enforceable notwithstanding contrary law.* Consequently, Heller is entitled to enforcement of its attorney's fee agreement despite its failure to comply with the North Carolina notice requirement.

*Heller,* 768 F.2d at 585 (emphasis added). The Fourth Circuit relied upon statements of the floor managers, in conjunction with the rejection of the House language as "a clear indication, that under the final version of the Bankruptcy Reform Act, Congress intended that state law should no longer govern the enforceability of attorney's fee agreements." *Id.* at 585. However, *Heller* concerned only attorneys' fee agreements, which were specifically addressed during the legislative process. The legislative history is silent with respect to prepayment charges.

■ The Supreme Court has stated that unless Congress explicitly chooses to exercise its constitutional authority to establish "uniform laws on the subject of Bankruptcies throughout the United States", state law should govern the determination of property rights in a debtor's estate. *Butner v. United States,* 440 U.S. 48, 54–56, 99 S.Ct. 914, 917–919, 59 L.Ed.2d 136 (1979). Reliance on state law by both state and federal courts within a state promotes certainty, reduces forum shopping, and "pre-

vent[s] a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" *Butner,* 440 U.S. at 55, 99 S.Ct. at 918.

■ The presumption in favor of state law notwithstanding, the *Heller* case is controlling. Section 506(b) explicitly provides for *"reasonable* fees, costs, or charges provided for under the agreement" (emphasis added). The reasonableness restriction limits both fees and charges. See *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). There is no basis in the statutory language of § 506(b) for concluding that the reasonableness standard should be applied to costs or charges differently than to attorneys' fees. The Fourth Circuit has recognized the primacy of federal law in this area by ruling that attorneys' fee arrangements are enforceable under § 506(b), notwithstanding a creditor's failure to comply with state law. *Heller,* 768 F.2d 580. See also *Mack Financial Corp. v. Ireson,* 53 B.R. 118, 120 (W.D.Va.1985) (court accepted the reasoning of state law, but recognized state law was not determinative of § 506(b) reasonableness), affirmed *Mack Financial Corp. v. Ireson,* 789 F.2d 1083 (4th Cir.1986). The reasonableness of costs and charges under 11 U.S.C. § 506(b) is a matter of federal law.

### IV. *Validity of Prepayment Premium under § 506(b).*

■ Although Fidelcor likely has a recognizable claim for its prepayment premium under New York law, the claim must meet the federal reasonableness standard of 11 U.S.C. § 506(b) for it to be allowed in a bankruptcy case. To evaluate reasonableness, the initial inquiry is the purpose for a prepayment premium. Generally, prepayment premiums protect lenders against falling interest rates. Without a prepayment premium, a borrower would have an incentive to refinance the debt, thus depriving the lender of the benefit of its bargain, namely, the unearned interest at above current market rates over the unexpired term of the loan. See *In re*

*Skyler Ridge,* 80 B.R. 500, 505 (Bankr. C.D.Cal.1987); *Matter of LHD Realty Corp.,* 726 F.2d 327, 330 (7th Cir.1984). On the other hand, if the loan was involuntarily prepaid when market interest rates were higher than the contractual rate, the lender could reinvest the funds at the higher rate, resulting in a windfall to the lender. See *In re Kroh Bros. Development Co.,* 88 B.R. 997, 1001 (Bankr.W.D.Mo.1988).

Several bankruptcy courts, in an attempt to prevent either a loss of interest income or a windfall to the creditor, have limited recovery of prepayment premiums to actual losses. See, *In re Imperial Coronado Partners, Ltd.,* 96 B.R. 997, 1001 (9th Cir. BAP 1989); *In re Kroh Bros. Development Co.,* 88 B.R. at 1001–2; *In re American Metals Corp.,* 31 B.R. 229, 237 (Bankr. D.Kan.1983); *In re Morse Tool, Inc.,* 87 B.R. 745, 750 (Bankr.D.Mass.1988). These courts employ a variety of methods to assess actual damages. For example, the bankruptcy courts in *In re Kroh Bros.* and *In re Skyler Ridge* held prepayment premiums unreasonable under state law and 11 U.S.C. § 506(b), since the formulas in the two cases (1) referenced United States Treasury notes, rather than first mortgage notes, and (2) did not discount the gross amount of lost interest to present value. *In re Kroh Bros. Development Co.,* 88 B.R. at 1001–1; *In re Skyler Ridge,* 80 B.R. at 505–07. These courts concluded that the formulas overcompensated lenders, since the formulas failed to account for the time value of money and assumed lenders would reinvest prepayment funds in treasury notes, rather than in higher yielding long-term first mortgage rates.

The Ninth Circuit Bankruptcy Appellate Panel adopted an approach that allows lenders to recoup the "difference between (1) the market rate of interest on the prepayment date, and (2) the contract rate, for the remaining term of the loan." *Imperial Coronado Partners, Ltd.,* 96 B.R. at 1001. This method ignores the formula utilized in the contract. Instead, it focuses primarily on protecting lenders from a drop in market interest rates.

In disallowing a prepayment charge, the bankruptcy court in *A.J. Lane* found that actual losses were easily proven since "[t]he damage formula is simple and well established. It is the difference in the interest yield between the contract rate and the market rate at the time of prepayment, projected over the term of the loan and then discounted to arrive at present value." *Id.* at 829. The prepayment charge in *A.J. Lane* was one percent of the amount prepaid, multiplied by the remaining term of the loan. The court reasoned that the charge did not bear a rational relationship to anticipated loss since the market rates for a fixed interest commercial loan were as likely to increase as decrease. It was unreasonable for the lender to assume a loss in the prepayment formula. *In re A.J. Lane & Co., Inc.,* 113 B.R. at 829. Additionally, the court found that the prepayment charge did not bear a reasonable relationship to the lender's actual loss, since the prime rate had risen and the lender actually benefitted from the prepayment. *Id.* Therefore, the charge was unreasonable, especially in light of the ease of proving actual loss. *Id.* at 829–830.

■ This court approves of actual damages as the measure of reasonableness for prepayment charges under 11 U.S.C. § 506(b). A prepayment charge formula must effectively estimate actual damages, otherwise, the charges may operate as either a penalty on the debtor or a windfall to a lender, at the expense of other creditors of the bankruptcy estate. Only a prepayment charge formula which reasonably measures actual damages will be respected under § 506(b). Case law suggests that actual damages are measured by the difference between the market rate of interest at the time of prepayment and the contract rate for the duration of the loan, discounted to present value. See *Imperial Coronado Partners, Ltd.,* 96 B.R. at 1001; *A.J. Lane & Co., Inc.,* 113 B.R. at 829.

■ The prepayment premium claimed by Fidelcor fails the reasonableness requirement of § 506(b). The prepayment charge formula presumes a loss. It produces the same result, regardless of wheth-

er market interest rates have gone up or down since inception of the loan. It does not reflect actual changes in market interest, and it fails to discount to present value. The prepayment charge formula does not effectively estimate actual damages, and consequently the charge is unreasonable under § 506(b).

Fidelcor has not claimed actual damages. Indeed, the nature of Fidelcor's contractual interest rate, a floating rate based on the prime rate, rather than a fixed rate, would suggest it is unlikely Fidelcor could show actual damages. Additionally, there is no suggestion Fidelcor could not have loaned the monies it collected to other customers at a similar floating rate based on the prime rate at the time of early payment.

Finally, it was Fidelcor that prompted the prepayment by its collection efforts. Fidelcor initiated its efforts in these cases by filing motions for relief from stay. Where the lender has exercised its option to accelerate upon default, the economic justification for a prepayment premium as alternative performance of the bargained loan is negated. See *Matter of LHD Realty Corporation*, 726 F.2d 327 (7th Cir. 1984); *A.J. Lane & Co., Inc.*, 113 B.R. at 826–27.

For these reasons, Fidelcor's prepayment charge will be disallowed in its entirety as not reasonable under 11 U.S.C. § 506(b). It constitutes a penalty to Debtors and the bankruptcy estate, as well as a windfall to Fidelcor.

## V. *Reasonableness of Fidelcor's Collection Costs.*

█ Fidelcor has claimed actual collection costs of $110,733.82, in addition to the prepayment charge. These costs include attorneys' fees, and they must also be reasonable under § 506(b). *Unsecured Creditors' Committee v. Walter E. Heller & Company*, 768 F.2d 580. The documentation filed by Fidelcor does not include sufficient justification for particular expenditures to enable the court to test the objections against the reasonableness standard. Consequently, a hearing will be scheduled for the objectors to further particularize their objections and to allow Fidelcor to provide justification for the challenged expenditures.

## VI. *Conclusion.*

Because Fidelcor's claim for a prepayment charge is disallowed, the Trustee's motion for turnover will be granted in part. The amount that Fidelcor will be required to turn over is $48,441.71, calculated by subtracting from total collections of $646,613.74, the unchallenged principal and interest of $487,438.21 and Fidelcor's documented expenses of $110,733.82. The latter will be subject to further order. The motions of Debtors, John Smith and Sovran will be denied since the Chapter 7 Trustee is the proper representative of the bankruptcy estate. This denial is without prejudice to Sovran's claim to these amounts as collateral. This ruling is also without prejudice to further relief based upon the challenges to Fidelcor's actual collection costs.