## In re OUTDOOR SPORTS HEADQUARTERS, INC. successor by merger to Munson Sporting Goods Co., Inc. and Seven Seas Products, Inc. and successor in interest to Southern Gun & Tackle, Inc., J.W. Murchison Company, Inc., Gopher Shooter's Supply Company, Inc., Dickerson Supply Company, Inc., Oscar Robbins and Company, Central Sales Corp., M. Sharf & Co., Southeastern Sporting Goods, Whitney Sporting Goods Company and Alpha Sports, Inc. doing business as Ressus Sporting Goods Co., Inc.

Bankruptcy No. 3–91–03160.

United States Bankruptcy Court, S.D. Ohio, W.D.

Dec. 6, 1993.

---

Lawrence T. Burick, Dayton, OH, for debtor.

Pamela Millard Stanek, Asst. U.S. Atty., Dayton, OH, for U.S. Small Business Admin.

DECISION ON ORDER DETERMINING THE AMOUNT OF THE SECURED CLAIM OF THE UNITED STATES ON BEHALF OF THE SMALL BUSINESS ADMINISTRATION AND REQUIRING PAYMENT

THOMAS F. WALDRON, Bankruptcy Judge.

## I. PRELIMINARY STATEMENT

This proceeding, which arises under 28 U.S.C. § 1334(b) in a case referred to this court by the Standing Order of Reference entered in this district on July 30, 1984, is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B)—allowance or disallowance of claims against the estate.

Before the court for determination is an Objection To Amended Proof Of Claim Of U.S. Small Business Administration (Doc. 860–1) filed by the debtor, Outdoor Sports Headquarters, Inc. ("OSHI").[1] Although this proceeding is before the court upon OSHI's objection to the amended proof of claim filed by the Small Business Administration (the "SBA"), this proceeding involves more than determining whether the amendment can be allowed or whether it must be disallowed. This proceeding requires a final determination of the allowed amount of the SBA's secured claim.

## II. FACTS

The parties filed a Joint Statement Of United States And Outdoor Sports Headquarters, Inc. Pertaining To Agreed Exhibits And Statement Of Facts ("Joint Statement") (Doc. 944–1). The Joint Statement, incorporated herein, provides:

1. On March 22, 1984, the J.W. Murchison Company ("Murchison") executed and delivered to Wilmington Industrial Development Company (the "Development Company") a promissory note ("Note") in the original principal sum of $500,000 (Ex. A).

2. The Note evidenced Murchison's obligation to repay a loan made to it under

---

1. In response, the United States of America on behalf of the SBA filed United States' Response To Debtor's Objection To United States' Amended Proof Of Claim (Doc. 901–1), United States' Supplemental Brief In Support Of Allowance Of Amended Proof Of Claim (Doc. 954–1), and United States' Response To Debtor's Supplemental Memorandum (Doc. 958–1). In connection with its objection and SBA's filings, OSHI filed a Reply Memorandum Of Outdoor Sports Headquarters, Inc. In Support Of Objection To Amended Proof Of Claim of U.S. Small Business Administration (Doc. 913–1), Supplemental Memorandum Of Outdoor Sports Headquarters, Inc. In Further Support Of Its Objection To Amended Proof Of Claim Of United States Of America, United States Small Business Administration (Doc. 951–1), the Affidavit Of Martin S. Altman (Doc. 952–1), and Final Supplemental Memorandum Of Outdoor Sports Headquarters, Inc. In Further Support Of OSHI Objection To Amended Proof Of Claim Of U.S. Small Business Administration (Doc. 956–1).

Pursuant to a subsequent order (Doc. 1089–1), the SBA filed United States' Application For Compensation And Reimbursement Of Expenses (Doc. 1109–1) and OSHI filed Memorandum Of Outdoor Sports Headquarters, Inc. In Opposition To United States' Application For Compensation And Reimbursement Of Expenses (Doc. 1117–1). The SBA also filed United States' Reply To Outdoor Sports' Opposition To United States' Application For Compensation (Doc. 1130–1); however, because this document is untimely it is not considered by the court.

the Small Business Act of 1958, as amended, 15 U.S.C. § 695 *et seq.*

3. On March 22, 1984, to secure repayment of the amount due under the Note, Murchison also executed and delivered to the Development Company a Deed of Trust as to property known as U.S. Highway 421 North, Wilmington, North Carolina (the "North Carolina Property") (Ex. B).

4. On March 22, 1984, Murchison also executed and delivered to the Development Company a Fiscal Agent Agreement, providing that Chemical Bank would collect all payments which Murchison made, and providing for the payment of certain servicing and processing fees associated with the loan (Ex. C).

5. On April 4, 1984, the Development Company assigned all of its right, title and interest in and to the Note and Deed of Trust to the Small Business Administration [the "SBA"], an agency of the United States ("United States") (Ex. D). As a result, the United States became the holder of the Note and Deed of Trust as to the North Carolina Property.

6. On May 9, 1984, the Development Company issued a Debenture in the face amount of $500,000 [the "Debenture"] (Ex. E). In order to fund its loan to Murchison, the Development Company then sold the Debenture publicly. The United States guaranteed the repayment of the Debenture.

7. On March 19, 1991, Debtor, Outdoor Sports Headquarters, Inc. ("OSHI"), executed a certain Second Assumption Agreement and thereby assumed the obligations of Murchison under the Note and Deed of Trust (Ex. G).

8. Thereafter, OSHI paid the Note in accordance with its terms until certain unsecured creditors initiated involuntary proceedings against OSHI under Chapter 7 of Title 11, United States Bankruptcy Code ("Bankruptcy Code").

9. On July 2, 1991, certain unsecured creditors filed an involuntary Chapter 7 proceeding against OSHI. Subsequently, an Order for relief was entered against OSHI under Chapter 11 of the Bankruptcy Code.

10. On October 15, 1991, OSHI filed its Schedule of Assets and Liabilities (Doc. # 68/34280). As part of Schedule D (creditors holding secured claims), OSHI listed the United States claim under the Note in the sum of $468,881.67, representing only the principal balance of the original amount loaned. OSHI did not list the United States claim as disputed, contingent or unliquidated.

11. On January 10, 1992, this court entered an Order requiring all creditors to file Proofs of Claim by no later than April 6, 1992 (the "Bar Date") (Doc. 149).

12. On February 4, 1992, prior to the lapse of this Bar Date, the United States timely filed its Proof of Claim (the "Original Proof of Claim") (Ex. P).

13. Prior to the Bar Date, United States knew that it possessed a claim against OSHI relating to an additional amount that would have to be repaid by OSHI under the Note in the event of its repayment prior to its maturity date [the "Prepayment Amount"].

14. On March 16, 1992, OSHI filed its Plan of Reorganization and related Disclosure Statement (Docs. 224 and 230). Thereafter, on May 19, 1992, OSHI filed its Amended Plan of Reorganization ["Amended Plan"] and related Disclosure Statement (Docs. 291 and 292). Thereafter, on June 18, 1992, OSHI filed its Modified Amended Plan of Reorganization (Doc. 328). Each plan and related disclosure statement discussed the proposed treatment of the United States claim. On May 20, 1992, this court entered an order (Doc. 294) approving the Disclosure Statement for OSHI's Amended Plan of Reorganization.

15. The United States did not file any formal objection to the Disclosure Statements. The United States did not attend the Disclosure Statement Hearing.

16. This court confirmed the OSHI Modified Amended Plan of Reorganization by an Order entered June 18, 1992 [the "Confirmed Plan"] (Doc. 326).

17. The United States did not file an objection to confirmation of the Amended Plan and did not attend the confirmation hearing.

18. On August 12, 1992, the Federal Financing Bank informed the United States that the amount required to prepay the Debenture equaled the sum of $461,-208.25 in principal, $17,463.44 in accrued interest, plus a Prepayment Amount of $242,333.89, or a total of $721,005.58 (Ex. M). The United States then requested that the Debenture be repaid (Ex. N).

19. In October, 1992, OSHI contacted the Development Company to request a payoff as to the amount due under the Note.

20. On November 10, 1992, OSHI, as Seller, and Frederick W. and Karen E. Spike, as Purchasers ("Purchasers"), entered into an Agreement of Purchase and Sale ("Sale Agreement"), as to OSHI's North Carolina Property (Ex. I). Under this Agreement, OSHI agreed to sell and the Purchasers agreed to buy the North Carolina Property for a total purchase price of $1,100,000 (the "Purchase Price").

21. On November 13, 1992, the United States provided OSHI with payoff figures (Ex. S).

22. On December 8, 1992, OSHI's Washington, D.C. counsel contacted the United States directly to object to OSHI's payment of a Prepayment Amount and to discuss release of the Deed of Trust as to the North Carolina Property. Thereafter, in early January, 1993, the United States notified OSHI's counsel that it agreed to escrow funds equal to a Prepayment Amount. Then, on January 13, 1993, just prior to the scheduled closing, the United States advised OSHI's counsel that it would not consent to an escrow agreement.

23. The closing for the sale of the North Carolina Property was scheduled for January 14, 1993, but the closing did not occur at that time because of the inability of OSHI and the United States to reach agreement with respect to the dispute concerning OSHI's obligation to pay a Prepayment Amount.

24. After negotiations for payment of the Note and release of the Deed of Trust as to the North Carolina Property deteriorated in mid-January, 1993, the United States, on January 27, 1993, filed its Amended Proof of Claim for the Prepayment Amount ["Amended Proof of Claim"] (Ex. Q).

25. Subsequent thereto, the United States agreed to escrow an amount equal to what it claimed to be the Prepayment Amount due to the United States. The parties then executed an Escrow Agreement dated March 30, 1993. The closing then took place and the sum of $268,407.75 was deposited in an escrow account pursuant to the terms of the Escrow Agreement, to be distributed in accordance with the court's ruling, and OSHI received $117,-807.19.

(Doc. 944–1).

Subsequently, the parties filed a Joint Filing By United States And Debtor Of Executed Escrow Agreement And Statement Regarding Escrow Account (Doc. 1107–1), in which the parties stipulated that the current balance in the escrow account as of October 12, 1993 is $271,380.00, consisting of principal of $268,407.75 and accrued interest of $2,972.75, plus an interest accrual of 2.25% per annum.

### III. ISSUES

1. Whether the doctrine of claim preclusion bars the Amended Proof of Claim, which includes the SBA's claim for the Prepayment Amount, and attorney fees and costs.

2. Whether the Amended Proof of Claim must be disallowed because it is a new claim or, if not, whether it must be disallowed because it is inequitable.

3. Whether the Prepayment Amount constitutes unmatured interest pursuant to 11 U.S.C. § 502(b)(2), is unreasonable or excessive under 11 U.S.C. § 506(b), or must be disallowed under equitable principles.

4. Whether the SBA is entitled to attorney fees and costs under 11 U.S.C. § 506(b).

## IV. DISCUSSION

A. *WHETHER THE DOCTRINE OF CLAIM PRECLUSION BARS THE AMENDED PROOF OF CLAIM WHICH INCLUDES THE PREPAYMENT AMOUNT AND THE SBA'S CLAIM FOR ATTORNEY FEES AND COSTS*

OSHI asserts that, because the SBA failed, initially, to properly assert a claim for the Prepayment Amount in the Original Proof of Claim, the doctrine of claim preclusion bars the Amended Proof of Claim filed after the Bar Date.

Bankruptcy provisions governing the bar date are different than bankruptcy provisions governing claim adjudications. The final determination of the allowed amount of a claim is a function of the claims adjudication process not a function of the bar date. *United States v. Kolstad (In re Kolstad),* 928 F.2d 171, 173–74 (5th Cir.1991). Bar dates do not "straitjacket creditors in incorrect claims" nor do they "fix in stone the final 'allowed' amounts of claims." *Id.* at 173–175. "[B]ar dates establish the universe of participants in the debtor's case, they have little correlation to the final amounts in which creditors will share any distribution." *Id.* at 174.

> [B]ankruptcy law is not supposed to function merely as a procedural gauntlet that only the most adroit or best represented creditors can overcome. The deadlines have a purpose: they enable a debtor and his creditors to know reasonably promptly, what parties are making claims against the estate and in what general amounts.

*Id.* at 173. Attendant to this analysis is the policy of allowing amended proofs of claim. Amendments to timely proofs of claim are liberally permitted and "do not vitiate the role of bar dates.". *Id.* at 175.

 Thus, the SBA's Amended Proof of Claim is not barred pursuant to the doctrine of claim preclusion merely because it was filed after the Bar Date and sets forth a claim in a different amount than that on the face sheet of the Original Proof of Claim. Likewise, the SBA's claim for attorney fees is not barred by the doctrine of claim preclu-

sion because they were not set forth on the Original Proof of Claim.

 OSHI further asserts that the provisions of the Disclosure Statement and Confirmed Plan bar the SBA, pursuant to the doctrine of claim preclusion, from claiming that it is entitled to the Prepayment Amount and to attorney fees and costs. Confirmation of a plan of reorganization constitutes a final judgment. *Id.; see In re Dooley,* 116 B.R. 573 (Bankr.S.D.Ohio 1990). Principles of claim preclusion bar relitigation of any issues raised or which could have been raised in the confirmation proceedings, *Still v. Rossville (In re Chattanooga Wholesale Antiques, Inc.),* 930 F.2d 458, 463 (6th Cir.1991); however, unlike a confirmed plan of reorganization, the provisions of a disclosure statement do not have claim preclusive effect. A disclosure statement is not a final decision on the merits. It is the provisions of a confirmed plan which constitute a final decision on the merits and for which creditors cast their ballots, not the disclosure statement. To give claim preclusive effect to a disclosure statement would undermine the provisions of a confirmed plan, the centerpiece of reorganization. *See In re Henderberg,* 108 B.R. 407, 414 (Bankr.N.D.N.Y.1989).

In this proceeding, the Disclosure Statement provides, in relevant part:

> The Allowed Secured Claim of SBA is secured by the same real property that secures the Allowed Secured Claim of NCNB. The Debtor believes that, as of the Petition Date, the total secured obligation was $468,881.00. The Debtor estimates that the indebtedness owing to SBA as of the Effective Date will be approximately $459,319.00. Thus, the estimated monthly interest payment to SBA subsequent to Confirmation will be approximately $5,150.00

(Doc. 291–1, p. 11).

The Confirmed Plan, in relevant part, provides:

> The following classes of claims and interest are, or may be, impaired under the Plan and will be treated as follows in full satisfaction of the claims or interest within each class:

. . . .

The Allowed Secured Claim of SBA[2] shall be satisfied by payment in full upon the sale of the property of the Debtor in which SBA has an interest. Commencing upon the Effective Date[3] and continuing thereafter until payment in full, the Debtor shall pay, on a monthly basis, in arrears, interest accruing on such Claim at the non-default rate as provided in the instrument evidencing such indebtedness. SBA shall retain the lien securing its Allowed Claim until payment in full.

(Doc. 328–1, pp. 9 and 11) (footnotes added). "Allowed Secured Claim" is defined in the Confirmed Plan as follows:

"Allowed Secured Claim" shall mean an Allowed Claim secured by a lien on property in which the Debtor has an interest, or which is subject to setoff under § 553 of the Code, to the extent of the value (determined in accordance with § 506(a) of the Code) of such creditor's interest in the Debtor's interest in such property, or to the extent of the amount subject to such setoff, as the case may be.

(Doc. 328–1, p. 2). The Confirmed Plan defines "Allowed Claim" as:

"Allowed Claim" shall mean a claim against the Debtor determined as of the Effective Date, (a) in respect of which a proof of claim has been filed with the Court within the applicable period of limitations fixed by Bankruptcy Rule 3003; (b) scheduled in the schedule of liabilities filed with the Court by the Debtor pursuant to § 521(1) of the Code and Bankruptcy Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount; or (c) of a kind specified in § 507(a)(1) of the Code, and in any case, as to which no objection to the allowance thereof has been interposed within any permissible or extended period of time, or as to which any

such objection has been determined by an order or judgment which is no longer subject to appeal and as to which no appeal is pending.

(Doc. 328–1, pp. 1–2).

Based upon the foregoing, although the Disclosure Statement in this proceeding sets forth what "[t]he Debtor believes" and what "[t]he Debtor estimates" to be the amount of indebtedness owed to the SBA, the Disclosure Statement is not entitled to claim preclusive effect.

■ Likewise, the Confirmed Plan is not entitled to claim preclusive effect on the issue of the final amount of the claim of the SBA. The Confirmed Plan does not specify an exact amount owed to the SBA, nor does it contain any language providing that the SBA's claim is limited to the amount listed by the SBA on the face sheet of the Original Proof of Claim. In fact, the Confirmed Plan provides that the SBA, the holder of an "allowed claim," generally defined as a claim supported by a timely proof of claim, shall receive "payment in full." The Confirmed Plan does not define or limit in any manner the phrase "payment in full." As the Eleventh Circuit stated in *Fawcett v. United States (In re Fawcett)*, 758 F.2d 588, 591 (11th Cir.1985):

If a debtor submits a generalized statement that it will pay secured creditors in full—100%, creditors are entitled to interpret that statement as guaranteeing the payment of each and every part of the creditor's claim. If the debtor wishes to be more specific and secure a confirmed plan that modifies the plain language of a 100% payment guarantee, it is the debtors' duty to put the creditor on notice by specifically detailing any exceptions.

The SBA filed a timely proof of claim and thus, shall receive "payment in full." Therefore, the Confirmed Plan does not bar the

---

**2.** SBA is defined in the Confirmed Plan as: "SBA" shall mean the United States Small Business Administration as the transferee of Wilmington Industrial Development, Inc. of a certain Five Hundred Thousand Dollar ($500,-000) Note dated March 22, 1984 made by Murchison and a certain North Carolina Deed of Trust dated March 22, 1984 wherein Mur-

chison is the Grantor, Roscoe L. Hanner is the Trustee and Wilmington Industrial Development, Inc. is the Beneficiary. (Doc. 328–1, p. 6).

**3.** The Confirmed Plan defines "Effective Date" as "the date which is eleven days after Confirmation." (Doc. 328–1 at p. 4).

Amended Proof of Claim pursuant to the doctrine of claim preclusion, nor does the Confirmed Plan bar the SBA's claim for attorney fees and costs.

### B. WHETHER THE AMENDED PROOF OF CLAIM MUST BE DISALLOWED BECAUSE IT IS A NEW CLAIM OR, IF NOT, WHETHER IT MUST BE DISALLOWED BECAUSE IT IS INEQUITABLE

OSHI asserts that the SBA's Amended Proof of Claim, which was filed after the Bar Date, must not be allowed because it sets forth a new claim. Alternatively, OSHI asserts that if the claim is not a new claim it must still be disallowed because allowance is inequitable.

■ At the outset, the court notes that a party seeking to amend its claim must first obtain leave of court. *In re Wilson*, 136 B.R. 719, 721 (Bankr.S.D.Ohio 1991). The SBA did not seek leave to amend the Original Proof of Claim; however, the court will not elevate form over substance. *See Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *United States v. International Horizons, Inc. (In re International Horizons, Inc.)*, 751 F.2d 1213, 1216 (11th Cir.1985); *Askew v. Channel (In re Askew)*, 61 B.R. 87, 89 (Bankr.S.D.Ohio 1986). Therefore, notwithstanding the SBA's procedural omission, the court will address whether the Amended Proof of Claim should be allowed.

■ If allowed, of course, the amendment relates back to the timely filed proof of claim. The determination of whether to permit an amendment to a timely filed proof of claim rests within the discretion of the court. *Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1, 10 (1st Cir. 1992); *In re First Truck Lines*, 141 B.R. 621, 629 (Bankr.S.D.Ohio 1992), *aff'd*, No. C–3–92–304 (S.D.Ohio, Sept. 21, 1993). In making this determination, courts have developed a two-part test. *First Truck Lines*, 141 B.R. at 629; *In re Parsons*, 135 B.R. 283, 284 (Bankr.S.D.Ohio 1991).

Under the first prong of the test, the court must determine whether the amendment reasonably relates to a timely filed claim or whether it is merely an attempt to file a new claim. *First Truck Lines*, 141 B.R. at 629. Amendments to proofs of claim are freely allowed to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. *International Horizons, Inc.*, 751 F.2d at 1216; *First Truck Lines*, 141 B.R. at 629. If the amount, however, is for a new claim it will be disallowed. *First Truck Lines*, 141 B.R. at 629. "[A]mendments intended merely to *increase* the amount of a claim grounded in the same *right to payment* are not considered 'new' claims under the Code." *Hemingway Transport*, 954 F.2d at 10 (emphasis in original).

■ Under the second prong, the court must perform an equitable analysis. *First Truck Lines*, 141 B.R. at 629. Factors considered in balancing the equities include:

1) whether there is undue prejudice to an opposing party,

2) whether other claimants might be harmed or prejudiced,

3) whether there is justification for the inability to file the amended claim at the time the original claim was filed,

4) whether there is bad faith or dilatory behavior on the part of the claimant,

5) whether other creditors would receive a windfall were the amendment not allowed.

*First Truck Lines*, 141 B.R. at 629–30 (citing *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr.S.D.N.Y.1990)); *see also Parsons*, 135 B.R. at 285.

The Original Proof of Claim was timely filed and includes a face sheet in the amount of "$490,665.79 plus A/I [accrued interest] [p]lus a daily per diem of $173.37 from 12/30/91." Several documents were attached, including: the Note, which contains provisions providing for a prepayment charge, the Deed of Trust, assumption agreements, and a SBA memo dated December 30, 1991 which lists the "net amount to prepay note" as $678,976.72 with a daily interest accrual of $173.37. The Original Proof of Claim is for payment under the Note. The Prepayment

Amount is grounded in the same right to payment as the Note. Therefore, the Amended Proof of Claim merely increases the amount of the claim grounded in the right to payment set forth in the Original Proof of Claim and does not assert a new claim.

Having met the first prong of the test, unless equitable considerations militate strongly against the amendment, it will be allowed. *First Truck Lines,* 141 B.R. at 630. The first two factors, pertaining to prejudice to the opposing party or to claimants, are the most crucial factors to consider when undergoing the equitable analysis. *See Roberts Farms Inc. v. Bultman (In re Roberts Farms Inc.),* 980 F.2d 1248, 1251 (9th Cir. 1992). Although most amendments to proofs of claims brought after the bar date create prejudice to the extent that their allowance will often diminish the amount of the otherwise available distribution, it is not whether such prejudice exists, but whether the prejudice is undue or substantial. Generally, substantial or undue prejudice involves an "irrevocable change in position or some other detrimental reliance on the status quo." *In re Dietz,* 136 B.R. 459, 469 (Bankr.E.D.Mich. 1992). *See also Roberts Farms,* 980 F.2d at 1252. "Passing milestones," such as passage of the bar date and confirmation of a debtor's plan, make amendment more prejudicial. *Holstein v. Brill,* 987 F.2d 1268, 1270 (7th Cir.1993).

With regard to whether there is undue prejudice to OSHI, OSHI asserts that it will be prejudiced if the amendment is allowed because it would have treated the SBA's claim differently in its plan of reorganization. Specifically, OSHI asserts that, "only after concluding that it was reasonably likely that significant equity existed in the North Carolina Property that OSHI determined that it was in its and in its estate's best interests to devote substantial resources post-confirmation. to apply current interest to the SBA while efforts were made to market the property. In addition, upon a sale of the North Carolina Property, OSHI perceived that the Debtor's reinvesting of the equity would benefit its creditors, due to their status as preferred shareholders under the Plan." (Doc.

913–1, pp. 22–23). Additionally, OSHI asserts that, if it had known of the SBA's claim for the Prepayment Amount, it would not have accepted the purchase price from the Purchasers but would have negotiated for a higher purchase price for the North Carolina Property. With regard to whether there is prejudice to OSHI's creditors if the Amended Proof of Claim is allowed, OSHI asserts that the creditors will be prejudiced because it will be "more difficult for OSHI's creditors as preferred shareholders to receive what they reasonably contemplated." (Doc. 913–1, p. 24–25).

Although this proceeding has moved beyond "passing milestones," the bar date has passed and OSHI's plan has been confirmed, the court must also consider the circumstances giving rise to the alleged prejudice. The alleged prejudice in this proceeding has arisen from the SBA's failure to include the Prepayment Amount on the face sheet of the Original Proof of Claim. At the outset, with respect to each of OSHI's allegations of prejudice, the court notes that the information supporting the SBA's Original Proof of Claim and the specific items in dispute were attached to the Original Proof of Claim. Thus, from the date of filing of the Original Proof of Claim, OSHI had the opportunity to examine all the documents and information necessary to fully evaluate the SBA's proof of claim. OSHI cannot blindly rely on the amount set forth on the face sheet of the proof of claim when it has attached documents that specifically support the right to the Prepayment Amount and that list the total amount due to prepay the Note. As previously stated, the amount set forth on the face sheet of the proof of claim may be a general amount and by no means does it "fix in stone" the final allowed amount of the claim. *Kolstad,* 928 F.2d at 173–74. It is the underlying right to payment which establishes the claim listed on the face sheet and ultimately determines the existence and amount of the allowed claim. OSHI may not rely on an "equitable" right to avoid payment and ignore a coextensive responsibility to determine the existence, validity, and total amount that was owed under the Note. This is especially true in this proceeding since OSHI has demonstrated that it exercises its

right to examine and challenge other claims and has done so by examining the documents the claimants have attached to their filings. It is not persuasive for OSHI to examine documents attached to claims for purposes of challenging a claim for its own benefit, and then argue that it does not have a responsibility to examine documents attached to claims which will not be beneficial to it. Finally, OSHI's suggestions of prejudice concerning a "different plan treatment" of the SBA claim, and "negotiations of a higher sale price" for the North Carolina Property are merely speculative, representing OSHI's hopes rather than facts which demonstrate prejudice.

With regard to the issue of whether other creditors would be prejudiced by the amendment, it must be recalled that the votes cast in favor of confirmation were for OSHI's plan which included provisions providing for payment of the full amount of the SBA claim. Recognizing this, in conjunction with the facts of this proceeding, including the substantial amount of equity existing in the North Carolina Property, in the amount of $378,994.42, and the creditors' "loss" of benefit from the greater amount of equity as they had "contemplated," the court determines that undue or substantial prejudice does not exist to preclude the court from allowing the Amended Proof of Claim. *See First Truck Lines,* 141 B.R. at 630; *Dietz,* 136 B.R. at 468–69.

The court must also consider whether the SBA acted in bad faith or in a dilatory manner. The court finds that, although the SBA could have made their claim for the Prepayment Amount clear on the face sheet of the proof of claim, OSHI has not presented the court with any evidence demonstrating that the SBA's failure to include the Prepayment Amount on the face sheet of the Original Proof of Claim was intentional or was in bad faith. The SBA stated that its failure to set forth the Prepayment Amount on the face sheet of the Original Proof of Claim was an "oversight." (Doc. 958–1, p. 5). OSHI emphasizes that the SBA knew of the Prepayment Amount yet did not "tell" OSHI; however, given that the attachment to the SBA's initial proof of claim contained the specific

documents and information supporting the amended SBA claim, in the circumstances of this proceeding, the court finds there was no bad faith on the part of the SBA.

In addition, the court finds that the SBA was not dilatory in filing the Amended Proof of Claim. Although the SBA filed its Amended Proof of Claim on January 27, 1993, almost ten months after the Bar Date, the SBA did file its Amended Proof of Claim shortly after it learned that OSHI was selling the North Carolina Property, that OSHI was disputing the claim for the Prepayment Amount, and that a resolution with respect to the payment of the Prepayment Amount could not be reached.

The final factor for the court to consider is whether other creditors would receive a windfall if the amendment were not allowed. A windfall, which is an unusual or unanticipated event, does not exist in this proceeding. The amount in dispute, the Prepayment Amount, is a normal anticipated event arising from the consensual agreement entered into by the parties concerning real property, which was sold without any "windfall" to any of the parties.

Based upon the foregoing, equitable considerations do not preclude allowance of the Amended Proof of Claim. Therefore, the Amended Proof of Claim is allowed.

C. *WHETHER THE PREPAYMENT AMOUNT CONSTITUTES UNMATURED INTEREST PURSUANT TO 11 U.S.C. § 502(b)(2), IS UNREASONABLE OR EXCESSIVE UNDER 11 U.S.C. § 506(b), OR MUST BE DISALLOWED UNDER EQUITABLE PRINCIPLES*

OSHI asserts that because the Prepayment Amount constitutes unmatured interest under § 502(b)(2) it should not be allowed. Section 502(b)(2) provides:

[I]f ... objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(2) such claim is for unmatured interest[.]

11 U.S.C. § 502(b)(2).

■ Prepayment amounts, although often computed as being interest that would have been received through the life of a loan, do not constitute unmatured interest because they fully mature pursuant to the provisions of the contract. *In re Skyler Ridge,* 80 B.R. 500, 508 (Bankr.C.D.Cal.1987); *In re 360 Inns, Ltd.,* 76 B.R. 573, 576 (Bankr.N.D.Tex. 1987). As a result of the parties' contractual agreements, reflected in the terms of the Note and mortgage, the SBA has a right to receive this payment if payment of the entire amount due pursuant to the Note is made prior to the full term of the contract. Therefore, the Prepayment Amount does not constitute unmatured interest and will not be disallowed pursuant to § 502(b)(2).

In addition, OSHI asserts that the Prepayment Amount must be disallowed because it is excessive and is not reasonable under § 506(b). Section 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). OSHI does not dispute that the SBA is oversecured, nor does OSHI dispute that the right to the Prepayment Amount exists under the Note or that the provisions providing for the Prepayment Amount are invalid. OSHI merely asserts that the Prepayment Amount is not reasonable.

■ Prepayment charges are encompassed in the term "charges," as used in § 506(b). *Imperial Coronado Partners, Ltd. v. Home Fed. Savings and Loan Ass'n (In re Imperial Coronado Partners, Ltd.),* 96 B.R. 997 (9th Cir. BAP 1989); *In re Duralite Truck Body & Container Corp.,* 153 B.R. 708, 711 (Bankr.D.Md.1993); *In re A.J. Lane & Co., Inc.,* 113 B.R. 821, 823 (Bankr.D.Mass. 1990). The issue of what constitutes a "rea-sonable" charge in this proceeding is a question of federal law. *Imperial Coronado Partners, Ltd.,* 96 B.R. at 1001; *Duralite,* 153 B.R. at 713; *A.J. Lane,* 113 B.R. at 823–25. In considering whether a prepayment charge is "reasonable" under § 506(b), the purpose underlying prepayment charges must be considered. Prepayment charges are designed to assure that the lender will receive the contractual rate of return agreed upon over the life of the loan. They protect a lender against falling interest rates, which give a borrower an incentive to refinance the loan, thereby depriving the lender of the interest it could have earned over the life of the loan. *See In re LHD Realty Corp.,* 726 F.2d 327 (7th Cir.1984); *Duralite,* 153 B.R. at 713; *Skyler Ridge,* 80 B.R. at 504.

■ In light of the economic rationale underlying prepayment charges, the court finds that "reasonable" charges under § 506(b) are those that compensate the lender for the harm caused by the prepayment, the amount of actual damages which result from the prepayment. *Imperial Coronado Partners, Ltd.,* 96 B.R. at 1001; *Duralite,* 153 B.R. at 714. "A prepayment charge formula must effectively estimate actual damages, otherwise, the charges may operate as either a penalty on the debtor or a windfall to a lender, at the expense of other creditors of the bankruptcy estate. Only a prepayment formula which reasonably measures actual damages will be respected under § 506(b)." *Duralite,* 153 B.R. at 714. Bankruptcy courts have determined that actual damages are measured by the difference between: 1) the market rate of interest on the prepayment date, and 2) the contract rate, for the remaining term of the loan, then discounted to arrive at present value. *See Imperial Coronado,* 96 B.R. at 1001; *Duralite,* 153 B.R. at 714; *A.J. Lane,* 113 B.R. at 829.

In this proceeding, the Note provides:

> Any prepayment in full must be accompanied by a prepayment fee in an amount sufficient to cover any prepayment costs of the development company in prepaying a debenture issued by the development company in conjunction with this financing. The debenture may be prepaid at such

price as will result in a yield from the date of prepayment to maturity, equal to the U.S. Treasury new issue yield for a security with a maturity and payment schedule comparable to the remaining maturity and payment schedule of the debenture, computed as of the close of the business two business days prior to the date of prepayment, plus accrued interest on the amount prepaid to the date of prepayment.

The Declaration of Allan S. Mandel ("Mandel Declaration"), the Director for the Office of Rural Affairs and Economic Development for the United States Small Business Administration, states that the debenture issued in connection with the loan to Murchison carried a United States Treasury approved interest rate of 13.289% per annum and that the interest rate of the Note of 13.31% was set to compensate for the difference between the Debenture and the Note. (Doc. 954–1, Ex. BB). The Treasury New Issue Yield as of the date of repurchase of the Debenture was 6.420%. (Ex. H to Amended Proof of Claim). The difference between the Treasury New Issue Yield and the face rate of the Debenture accounts for the Prepayment Amount.

OSHI asserts that the formula to determine the Prepayment Amount is not appropriate because "[i]t compares the yield received by the SBA on second mortgage commercial lending (the 13.311% rate for the Note) with the yield to be paid by the U.S. Treasury for new issues with a similar maturity and payment schedule." (Doc. 913–1, p. 36). OSHI's argument is not persuasive. The Mandel Declaration provides:

"[T]he United States Treasury approves the interest rate on the debenture and loan which is established by determining the cost to the Treasury of issuing an obligation with a comparable maturity and payment stream as that debenture being issued and then adding an administrative charge of 1/8th of 1%. The *same* formula used to determine the rate of interest on the debenture is used in the determination of the prepayment amount."

(Doc. 954–1, Ex. BB, p. 2; emphasis added). Thus, the interest rates used by the SBA are comparable. The SBA uses the same meth-od to determine the interest rate for the debenture and loan as it does for a comparable debenture and loan existing at the time of prepayment. Additionally, the court notes that, "[t]he price to prepay the debenture equals the present value of the future stream of payments remaining on the term." (Doc. 954–1, Ex. BB, Mandel Declaration). Furthermore, the Mandel Declaration provides:

Neither the SBA nor the Federal Financing Bank will realize an economic gain from the payment of the premium by Outdoor Sports Headquarters, Inc. If the proceeds from payment of the premium are not repaid by the borrower, the SBA will suffer an actual pecuniary loss in the amount of $268,407.75 plus interest that continues to accumulate on the premium at the rate of 13.31% per annum.

(Doc. 954–1, Ex. BB, p. 5).

The foregoing, including the undisputed Mandel Declaration, establishes that the method used by the SBA for determining the Prepayment Amount measures actual damages and that the Prepayment Amount equals actual damages.

OSHI further asserts that the amount is excessive in relation to the principal balance due under the Note. Although "reasonable" charges are determined by measuring the amount of actual damages, this amount may be so large, considering the totality of the circumstances, that it would be unjust to the estate and thus, may be avoided under the § 506(b) reasonableness standard. *See Fin. Center Assocs. of East Meadow, L.P. v. The Funding Corp. (In re Fin. Center Assocs. of East Meadow, L.P.).* 140 B.R. 829, 839 (Bankr.E.D.N.Y.1992).

In this proceeding, the Prepayment Amount is large in comparison to the principal balance under the Note; however, considering the large amount of equity in the North Carolina Property, $378,994.42, and the absence of substantial prejudice to OSHI or other creditors, as previously discussed, the court does not find the Prepayment Amount unjust or excessive.

OSHI's final assertion is that the SBA claim for the Prepayment Amount

should be barred pursuant to equitable principles. In addressing several of OSHI's previous arguments, the court employed equitable analyses. Therefore, the court does not find it necessary to readdress whether allowance of the Prepayment Amount is equitable. Furthermore, the court notes that although "bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships," *United States v. Energy Resources Co.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990), a bankruptcy court's equitable authority cannot contravene specific provisions of the Bankruptcy Code. *Terex Corp. v. Metropolitan Life Ins. Co. (In re Terex)*, 984 F.2d 170, 173 (6th Cir.1993). In this proceeding, 11 U.S.C. § 502 and 506 and applicable case law specifically provide for the allowance of the Prepayment Amount.

Thus, the SBA is entitled to a Prepayment Amount of $281,199.80 plus a per diem of $95.90 since October 8, 1993.[4]

### D. WHETHER THE SBA IS ENTITLED TO COSTS AND ATTORNEY FEES UNDER § 506(b)

■ The SBA asserts that it is entitled to costs and attorney fees pursuant to § 506(b).[5] To obtain attorney fees under § 506(b), a creditor bears the burden in establishing that: (1) the value of the collateral exceeds the amount of the principal debt, accrued interest, fees, and costs sought; (2) the underlying note or agreement provides for such fees; and (3) the fees are reason-

able. *In re Campbell*, 138 B.R. 184, 186 (Bankr.S.D.Ohio 1991).

It is undisputed that the value of the North Carolina Property exceeds the principal balance of the debt plus interest, fees, and costs. Further, OSHI does not dispute that the Note provides for the payment of attorney fees. OSHI does dispute, however, that the SBA has actually "incurred" the obligation to pay fees totalling $22,385.00.[6] OSHI contends that the SBA has not incurred this expense because the SBA has not actually paid any attorney fees for any purpose contemplated under the Note. In support of its contention, OSHI asserts that the salary of the Special Assistant United States Attorney who represents the SBA is an expense which the SBA incurred without regard to the work required by this proceeding and is not the type of cost referenced in the Note. OSHI further contends that the SBA has not established that the fees are directly attributable to the Note. In support of its contentions, OSHI cites *In re Davidson Metals, Inc.*, 152 B.R. 917 (Bankr.N.D.Ohio 1993).

In *Davidson Metals*, the creditor, Society Bank, was represented by an "outside" law firm. Society's representation by this law firm was often duplicated with its own in-house counsel. Society's in-house counsel sought attorney fees pursuant to security agreements which it had with the debtor, Davidson Metals. The security agreements provided that Society was entitled "to recoup 'all court costs and attorney's fees and every

---

4. These amounts were set forth in the United States' Application For Compensation And Reimbursement Of Expenses (Doc. 1109–1).

5. Originally, the SBA attached a Declaration In Support Of Allowance Of Reasonable Attorney's Fees ("Declaration") (Doc. 954–1, Ex. D) to United States' Supplemental Brief In Support Of Allowance Of Amended Proof Of Claim (Doc. 954–1) stating that its attorney has "devoted approximately 175 hours of time in the preparation of and execution of [his] duties as Special Assistant in this case since the beginning of January, 1993" and that "[a] reasonable hourly rate in the Dayton community for such work performed in this case is $110.00 per hour." (Doc. 954–1, Ex. D). Because the Declaration was insufficiently detailed, the court ordered that the SBA file a specific request for attorney fees and expenses

which contained the information required by Local Bankruptcy Rule 4.4(a). In compliance with this order the SBA filed United States' Application For Compensation And Reimbursement Of Expenses (Doc. 1109–1). In response, OSHI filed a Memorandum Of Outdoor Sports Headquarters, Inc. In Opposition To United States' Application For Compensation And Reimbursement Of Expenses (Doc. 1117–1).

The SBA also filed United States' Reply To Outdoor Sports, Opposition To United States' Application For Compensation (Doc. 1130–1). This document was not timely filed; therefore, the court does not consider the arguments contained therein.

6. OSHI accepts the factual statement that the SBA incurred copying charges and delivery expenses totalling $420.86.

other cost, expense or liability, if any, incurred or paid by [Society] in connection with [the security agreements] ...', and further stated that Davidson Metals 'shall ... defend, indemnify and save [Society] harmless from and against every out-of-pocket cost, expense, loss or liability (as the case may be), if any, incurred by [Society] by reason of this Security Agreement....'" *Davidson Metals,* 152 B.R. at 923. The court noted,

> In-house counsel appeared at, and billed for, appearances at many hearings before the court where Thompson, Hine & Flory personnel ["outside" counsel] was also present, with no showing that multiple representation was needed. This same sort of duplication of effort appears intermittently throughout the many conference and meeting entries in the First and Second Applications.

*Id.* Additionally, the court concluded that Society's in-house counsel was not entitled to its fees, stating:

> The court fails to see how the cost of employing in-house counsel is directly attributable to Davidson Metals' security agreements. Looking at it another way, nothing in the loan documents requires Davidson Metals to assume responsibility for paying any portion of Society's pre-existing overhead costs, namely, the continuing salary, benefits, etc. of its employees. Whatever obligation exists to compensate in-house attorneys remains with Society. Society has cited no persuasive statutory or case law authority for their proposed policy that would, in effect, make in-house legal departments profit generating centers.

*Id.* at 924.

To the extent that OSHI's reliance on *Davidson* rests on a "duplication of services" argument, *Davidson* is not applicable in the facts of this proceeding. It is undisputed that only the SBA's attorney, and no outside counsel rendered legal services to the SBA. To the extent that OSHI asserts that *David-*

son stands for the proposition that the language of § 506 would not permit an award of attorney fees to any "in-house" counsel, this court concludes that OSHI's position adds language to *Davidson* and § 506 that is not present in the text of either. In this proceeding, the Note provides that OSHI:

> [S]hall pay all expenses of any nature, whether incurred in or out of court, and whether incurred before or after this Note shall become due at its maturity date or otherwise including but not limited to reasonable attorney's fees and costs, which Holder may deem necessary or proper in connection with the satisfaction of the Indebtedness or the administration, supervision, preservation, protection of (including, but not limited to, the maintenance of adequate insurance) or the realization upon the Collateral.

This Note was entered into by the United States. The United States, in almost all circumstances, does not hire outside counsel to represent it but maintains a staff of attorneys. To afford the plain meaning of the language chosen by both parties to this Note, the language "all expenses of any nature, whether incurred in or out of court, and whether incurred before or after this Note shall become due at its maturity date or otherwise including but not limited to reasonable attorney's fees and costs" must be interpreted to include the attorney fees and expenses of the United States.

Under OSHI's argument the United States would never receive attorney fees under § 506(b), without perhaps the service of outside counsel, regardless of the fact that the words appear in the underlying agreement signed by both parties. Also, OSHI's position would require § 506 to read that there shall be allowed to an oversecured creditor "any reasonable fees, unless counsel is 'in-house' or employed by the United States Government." [7]

An argument identical to OSHI's was rejected by the Fifth Circuit in *United States*

---

7. Congress knows how to draft statutory language which excludes the United States from receiving attorney fees and expenses. This is demonstrated by the language contained in 28 U.S.C. § 2412(d)(1)(A) which provides, "[e]xcept

as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses...."

*v. Myers*, 363 F.2d 615 (5th Cir.1966). In *Myers*, the United States was awarded reasonable attorney's fees incurred in its defense against Government Employees Insurance Company (GEIC). GEIC asserted that the Government had not incurred attorney's fees because the United States attorneys are on the government payroll as salaried employees and should not be allowed any recovery therefor. *Id.* at 621. The appeals court rejected GEIC's argument, stating:

> Without question GEIC breached its contractual duty to defend the United States; and this breach of duty compelled the United States to defend the suit solely on its own. Ordinarily where an insured must conduct its own defense due to an unwarranted refusal to defend by the insurer, the insured is entitled to recover the expenses of litigation, including attorney's fees. 7A Appleman, Insurance Law and Practice, Sections 4689–91 (1962). We can conceive of no sound reason for denying the United States, since it too was an 'insured' under the policy, this right of reimbursement, to which every other 'insured' would be entitled. A different result is not required merely because the attorneys representing the United States are Government employees, and are paid a salary by the United States for performing their services.

*Id.* at 621.

The court must also determine whether these fees were incurred in connection with the Note and are reasonable. In making this determination,

> [A] brief description of the work performed is essential for this court's evaluation of fees. Time records which merely note that a telephone conference was held will be deemed insufficient. At a minimum, time entries for conferences and telephone calls should identify who was spoken to and specify what was discussed. If research was performed, a description of the research should be given. Time entries for drafting documents should specify the document involved.

*In re Vlachos*, 61 B.R. 473, 481 (Bankr. S.D.Ohio 1986) (quoting *In re Baldwin–United Corporation*, 45 B.R. 381 (Bankr.S.D.Ohio 1984)). The attorney's fee is derived by using the lodestar method of fee calculation. *Boddy v. United States Bankruptcy Court (In re Boddy)*, 950 F.2d 334, 337 (6th Cir. 1991).

Upon review of the SBA's application, which is sufficiently detailed, this court concludes that the hourly rate of $110.00 per hour charged by the SBA's attorney is reasonable. Further, the court concludes that the 203.50 hours spent in this proceeding is reasonable and that the hours were spent in connection with the Note. The court also finds that the expenses in the amount of $420.86 are reasonable. Therefore, the total amount of attorney fees and expenses to be paid to the SBA is $22,805.86.[8]

## V. CONCLUSION

Based upon the foregoing, the court determines that the United States, on behalf of the SBA, has a claim in this proceeding in the amount of two hundred eighty-one thousand one hundred ninety-nine dollars and eighty cents ($281,199.80) plus a per diem of ninety-five dollars and ninety cents ($95.90) after October 8, 1993 together with attorney fees and expenses in the amount of twenty-two thousand eight hundred five dollars and eighty-six cents ($22,805.86).

Accordingly, the court orders that the amount being held in escrow from the North Carolina Property be released to the SBA and because the escrow monies are insufficient to pay the full amount of the SBA's claim, that the SBA be paid the remaining

---

**8.** The SBA has also asserted that it is entitled to a ten percent surcharge under 28 U.S.C. § 3011, a provision of the Federal Debt Collection Procedure Act. (Doc. 901–1, p. 19). Pursuant to 28 U.S.C. § 3011(b), the United States in not entitled to a surcharge if:

> (1) the United States receives an attorney's fee in connection with the enforcement of the claim; or

> (2) the law pursuant to which the action on the claim is based provides any other amount to cover such cost.

Therefore, because 11 U.S.C. § 506(b) provides for the payment of reasonable costs and fees, 28 U.S.C. § 3011 is not applicable.

amount of the claim from the proceeds of the sale of the North Carolina Property previously received by OSHI.

An order in accordance with this decision is simultaneously entered.

SO ORDERED.